AUSTIN W. JONES COMPANY *vs.* THE STATE OF MAINE.

Penobscot.   Opinion February 9, 1923.

*While a State is not responsible for the malfeasance, or wrongs, or negligence, or omissions of duty of its subordinate officers or agents employed in the public service, it may by legislative enactment, remove such immunity, by laying aside the protection furnished by the common law, and become subject to the same liabilities as though it were an individual.*

In the instant case the negligence of the superintendent of the hospital, the lack of negligence on the part of the plaintiff and the causal relation between the negligence of the superintendent and the damages sustained by the plaintiff, were all questions of fact which were determined by the jury, after a full, fair and impartial trial, and the findings of the jury are not so manifestly wrong or the result of bias or prejudice as to warrant the interference of the court by granting a new trial.

It appears from examination of the testimony that the verdict included damages for loss of prospective value of the young stock by reason of the destruction of the older members of the herd, which if allowed to live would by dairy record or record of progeniture enhance the value of the younger stock, which damages are speculative in their nature and not recoverable.

On exceptions and motion for a new trial. An action brought by plaintiff corporation against the State of Maine under the authority of a Special Resolve passed by the Legislature of this State in which the plaintiff was authorized to bring suit. The State maintains at Bangor, a hospital for the insane. On April 25, 1920, one George Stanchfield, an inmate, having been duly committed on February 15, 1920, was temporarily allowed his liberty by authority of the superintendent of the institution, and given into the charge of his mother with whom he remained until May 9, 1920, when it was alleged he set fire to the buildings of the plaintiff corporation resulting in great damage.

The case was tried to a jury and a verdict of $23,650.00 for plaintiff was rendered. The defendant filed a general motion for a new trial, and also took exceptions concerning the introduction and exclusion of certain testimony, and also excepted to the refusal of the presiding Justice to give requested instructions. Exceptions overruled. If plaintiff, within thirty days after receipt of rescript, remits $5000 from the verdict, then motion overruled, otherwise, motion sustained and new trial granted.

The case is fully stated in the opinion.

*William R. Pattangall and Benjamin W. Blanchard,* for plaintiff.

*Ransford W. Shaw, Attorney General and William H. Fisher, Deputy Attorney General,* for defendant.

SITTING: CORNISH, C. J., SPEAR, PHILBROOK, DUNN, WILSON, DEASY, JJ.

PHILBROOK, J. On the ninth day of May, A. D., 1920, certain buildings and personal property owned by the plaintiff corporation were destroyed by fire. It claimed that the fire was kindled by one George Stanchfield, who was formerly a patient at the Bangor State Hospital, an institution operated, maintained and supported as an asylum for the care, custody and treatment of insane persons. According to the record it is admitted that the defendant owns and operates the hospital; that it is an institution for the care of the insane; that Dr. Carl J. Hedin is superintendent of the hospital; that he is employed by the State; and that he has general supervision of the inmates therein. Plaintiff further claimed that on the fifteenth day of February, A. D., 1920, Stanchfield was duly committed to said

hospital and accepted into the custody thereof; that at the time of commitment he was suffering from a mental disease known as dementia praecox, paranoid type; that on April 25th, A. D., 1920, he was temporarily allowed his liberty by Dr. Hedin; that at the time when he was allowed his liberty he was still insane, a fact well known by Dr. Hedin, and was a dangerous man, not safe to be at large or to be allowed temporary liberty; that when allowed liberty he was given into the care and custody of one Bessie M. Stanchfield who was not a suitable and proper person to have the care and custody of said George Stanchfield, a fact which Dr. Hedin knew or by the exercise of ordinary prudence should have known.

The plaintiff alleges, as we have said, that the fire which destroyed its property was kindled by Stanchfield and charges "that said defendant was, on the twenty-fifth day of April, A. D., 1920, grossly careless and negligent in permitting said George Stanchfield to be temporarily at large," and further avers "that by, through and because of the gross carelessness and negligence of the defendant, as aforesaid," it suffered the loss sustained by the destructive fire.

The plaintiff further avers that this action is brought against the defendant in accordance with a legislative resolve authorizing the same.

Trial by jury in the Superior Court of Penobscot County resulted in a verdict for the plaintiff in the sum of twenty-three thousand, six hundred fifty dollars.   The case is before us upon exceptions and upon a general motion for a new trial based upon the customary grounds.

It is not necessary to rehearse in full the resolve authorizing this suit.   The important provision therein contained, so far as the main contention in the bill of exceptions is concerned, is thus expressed: "The liabilities of the parties shall be the same as the liabilities between individuals."

THE EXCEPTIONS.

The exceptions contained in the bill are six in number, but in argument the State's counsel frankly says that the exception relied upon is to the refusal of the court to give the following instruction: "The Court is requested to instruct the jury that notwithstanding the language of the resolve by authority of which this suit is brought, the State, as a matter of law, is not liable for the negligence or want

of care of its officials or employees." The other five exceptions are not referred to in the brief for the State and we shall consider them as abandoned.

In support of its exception the State cites several cases. The first is *Ray County* v. *Bentley et al.*, 49 Missouri, 236. In that case a County Court, charged with the duties of administering certain school funds, made an erroneous order growing out of the sale of property which had been mortgaged to the county to secure a loan of a portion of the fund. The court pointed out that the school lands were vested in the State in trust for the benefit of the inhabitants of the townships in which they were respectively situated; that the State vested the management of this trust in the County Courts; that those courts were the agents of the State for that purpose; that the State was not affected by the laches of her agents; that, as in the case of a corporation, where the acts or omissions from which injury results, are done or omitted in the exercise of a corporate franchise conferred upon the corporation for the public good, and not for private corporate aid, the corporation is not liable for the consequences of such acts or omissions on the part of its officers and servants; that the County Courts were intrusted with the management and care of the school fund for public good, and not for any private gain that would accrue either to them or to the counties. And the court closed its opinion with the following words, which are quoted in the brief for the defendant and relied upon by it: "The State can only act through her officers, and great losses would result if it should be maintained that she was liable for the negligence or omissions of those to whom she is compelled to confide the management of her pecuniary concerns." The quotation just made approaches dictum, as to that case, for the essential question which there required determination was whether that County Court possessed the power, at public sale, to buy in the land in the name of, and for the use of, a county. The opinion holds that the County Court had no power to purchase the land, or hold the same, unless that power was given it by statute, which power did not exist, and hence where the sale complained of was for an insufficient sum the county had the right to maintain an action to recover the balance due on the mortgage. The liability of the State to a private individual, on either contract or tort, as in the case at bar, did not form an element of that case and we cannot consider it applicable to the present contention.

*Chapman* v. *State*, 104 Cal., 690, reported in 43 Am. St. Rep., 158, is a case where the State of California, owning certain public wharves in the city of San Francisco, in consideration of wharfage and dockage charges, paid to the State Board of Harbor Commissioners, received upon one of its public wharves a certain quantity of coal. A portion of the wharf broke and gave way whereby the coal was sunk and became a total loss. In that State a general statute obtains, the first section of which provides; "All persons who have, or shall hereafter have, claims on contract or for negligence against the State, not allowed by the State board of examiners, are hereby authorized, on the terms and conditions herein contained, to bring suit thereon against the State in any of the courts of this State of competent jurisdiction and prosecute the same to final judgment." The court there declared the law to be well settled that, in the absence of a statute voluntarily assuming such liability, the State is not liable in damages for the negligent acts of its officers while engaged in discharging ordinary official duties pertaining to the administration of the government, but pointed out the fact that the State had entered into the business of a wharfinger, a business apart from its ordinary official duties pertaining to the administration of government, and that therefore the State was bound by its contract as a wharfinger to the same extent as a private person engaged in a like business would be. Under that situation, and by virtue of the statute just quoted, the demurrer to the declaration was overruled and the case stood for trial. The court was there called upon to determine whether the State was liable for the negligence of its servants engaged in a business other than that of discharging ordinary, official duties pertaining to the administration of government, and while doing so held fast to the doctrine of non-liability of the State for the negligent acts of its officers while they were engaged in discharging ordinary, official duties; but even then pointed out that under an enabling statute the State might be so liable. Here again it should be observed, not only that the broad terms of the enabling act, in the case at bar, distinguishes it from the California case, as to principles of liability, but also agrees with the latter when an enabling act presents a different condition.

*Wilson* v. *Simmons*, 89 Maine, 242, is a case where a street commissioner was sued in trespass for removing certain trees, digging up the soil, and other trespasses in front of the plaintiff's house. The

court there discussed a large number of legal questions involved in that case, but the learned counsel in his argument has failed to indicate to us any question there discussed which is applicable to the case at bar and we are unable to discover any.

*Clark* v. *The State et al.*, 7 Coldwell (Tenn.), 306, decided in 1869, is a case arising under a statute authorizing the organization of banks under what was known as The Free Banking Law. The bank so organized was required to deposit a certain amount of bonds with the State Comptroller, and thereupon the bank received from the Comptroller an equal amount of circulating notes, the bonds being held for the payment of the notes. At no time were the circulating notes to exceed the value of the bonds. "The business of the Comptroller's office was, for a long time, conducted with utter blundering incompetency and carelessness," said the court, and finally, by disappearance of some of the bonds and an increase of issue of circulating notes, the latter far exceeded the amount of the bonds. Suit was brought against the State charging it with responsibility for the default of the Comptroller, and demanding that it should redeem the circulating notes. The constitution of that State provides that writs may be brought against the State in such manner and in such courts as the Legislature may direct, and the Code provides that "actions may be instituted against the State under the same rules and regulations that govern actions between private persons." Concerning the law governing the case the court said: "The constitutional and statutory provisions provide a remedy for any existing cause of action, but do not change the relation between the State and the citizen so as to create any liability or responsibility on the part of the State. The relation of the State to the citizen is not one of contract, which implies an undertaking, upon good consideration, on the part of the State, that all the functions of government shall be duly performed, or that it will employ none but capable and faithful servants. If an officer or agent of the State, in violation of law, commits an act to the injury of the citizen, it is an act beyond the scope of his agency, unauthorized by his principal, and the State is not liable therefor to the party injured." The court then proceeds to point out that the law in that case provides for the creation of the trust fund and directs the mode of its administration, but declares that this does not constitute the State itself as the trustee, and subject itself to all the liabilities and responsibilities attaching to that

character.   Further quoting, "The State has provided by law that certain tribunals or officers shall be the custodians of the funds in question, but this does not render the State liable as trustee, bailee, or agent.   Hence, it follows that, though where the statute gives the remedy, the State may be sued upon its contracts with its citizens, such a statute merely gives a remedy, but does not create any new liability, and does not, without more, render the State liable to an action for the negligence or the torts of its officers and agents.   The State is therefore not liable to the complainants for the loss of the securities deposited in this case, or for the wrongful over-issue by the officers of the State of circulating notes, if such over-issue occurred, unless it had made an undertaking to that effect."   The liability of the State upon contract or tort is thus clearly set forth, and the liability is plainly declared when the State enters or does not enter into an undertaking which would create such liability upon contract or tort.

.   *Clodfelter* v. *State of North Carolina,* 86 N. C., 51; 41 Am. Rep. 440. The plaintiff in this case was a person sentenced to hard labor in State Prison for a series of years, and while serving sentence was assigned to work in the construction of a railway.   While thus employed he sustained an injury owing to the premature explosion of a rock-blasting operation.   Plaintiff claimed negligence on the part of the overseer under whom he was working and brought suit against the State to recover damages.   In that State, at the time when this case was reported, there was a constitutional provision conferring jurisdiction upon the Supreme Court "to hear claims against the State," but the court declared that this provision was confined to such claims as are legal and could be enforced if the State, like one of its citizens, was amenable to process, and even then the decision when made was merely recommendatory.   It was held that the only question presented was whether the State in administering the functions of government through its appointed agents and officers was legally liable to a claim in compensatory damages for an injury resulting from misconduct or negligence of the servants of the State. "That the doctrine of respondeat superior, applicable to the relations of principal and agent created between other persons, does not prevail against the sovereign in the necessary employment of public agents, is too well settled upon authority and practise to admit of controversy," said the court and the plaintiff's right of action and claim against the State were denied.

*Gibbons* v. *The United States*, 8 Wall., 269. This was an action brought to recover various sums alleged to be due the plaintiff for damages arising out of transactions connected with breach of contract for furnishing oats to the United States. The case was originally presented before the court of claims, which denied liability. The language of the statute which conferred jurisdiction upon the court of claims excluded by the strongest implication any demand against the government which was founded on a tort. The court declared that the case was presented as an attempt under the assumption of an implied contract to make the government responsible for tortious acts of an officer of the government, and held that the general principle, which is applicable to all governments, forbids that they should hold themselves liable for unauthorized wrongs inflicted by their officers on citizens, while engaged in the discharge of official duties. The enabling power as given to the court of claims, while presenting a novel feature in jurisprudence, confined the power of the act to suits founded on contracts, express or implied, with certain unimportant exceptions. The claim of the plaintiff was dismissed.

*Rose* v. *The Governor of Texas*, 24 Texas, 496. Two questions were presented in the case, one of which was the construction of an act in regard to the establishment of a general land office and the other was whether, under a given statute, the plaintiffs were qualified to maintain suit against the State, they being aliens. Both claims were decided adversely to the plaintiff, and in closing, the court used this language: "The right to sue the governor of the State, is a matter of favor conferred by the State, in deregation of that immunity, which every sovereignty enjoys; and we think that statutes conferring such privileges should be construed with strictness so as to extend the right only to those by whom it was clearly intended that it should be enjoyed."

*The State* v. *Hill, Appellee*, 54 Ala., 67. Judgment had been rendered in this cause against the State in a suit brought by the appellee to recover damages for animals alleged to have been killed by the wrongful act of the agents of the State when operating a certain railroad company. At the time of the decision, under the revised code then in operation, the court held that the section authorizing suit against the State was intended only to afford to persons who had claims against the State a mode of ascertaining whether or not they were well founded, and if they were, what sum of money or

other thing was due them, but it was not the purpose or effect of the statute to create liability on the part of the State to its citizens or to subject it to a liability which did not exist or could not arise under laws then existing. The court sustained the appeal of the State and set aside the judgment, quoting the familiar language of Story on Agency, Section 319; "It is plain that the government itself is not responsible for the malfeasances, or wrongs, or negligences, or omissions of duty of the subordinate officers or agents employed in the public service; for it does not undertake to guaranty to any persons the fidelity of any of the officers or agents whom it employs; since that would involve it, in all its operations, in endless embarassments and difficulties and losses which would be subversive of the public interests."

We have thus briefly referred to every case cited by the learned Attorney General in his brief for the State, but no opinion therein given, when carefully examined, goes further than to reiterate the well established principles that, in the absence of express legislation conferring a right or remedy, suit cannot be maintained against a sovereign state to recover damages for the malfeasance, misfeasance, laches or unauthorized exercise of power by its officers and agents; that in the absence of such legislation the doctrine of respondeat superior, applicable to the relations of principal and agent created between other persons does not prevail against the State in the necessary employment of public agents; that by a great majority of recent cases it has been decided that in the absence of such legislation even a private charitable institution which has exercised due care in the selection of its employees cannot be held liable for injuries resulting from their negligence; and in the absence of such legislation, that a purely eleemosynary institution created by the State and maintained at its expense cannot be held responsible for a tort committed by a lunatic of whom it has custody. As to the latter it has been repeatedly held, upon highest authority, that the reason is two-fold, (1) That the rule of respondeat superior does not apply, (2) That funds of such a beneficial institution should not be diverted from their original charitable purposes by judgments for the negligent or tortious acts of its servants or inmates.

But after careful consideration of the wording of the express legislation in the instant case we are of opinion that the State laid aside the protecting shield furnished by the common law and entered

this contest upon the same terms of respondeat superior as would govern if the State were a private individual. Such being our opinion the exception relied upon by the State must be overruled.

## THE MOTION.

Bearing in mind that admittedly Dr. Hedin was the superintendent of the Bangor State Hospital, was employed by the State, had general supervision of the inmates therein, and that the principle of respondeat superior is to obtain, we approach the consideration of the motion in the same way that we would approach it if the parties were private individuals.

The action charges negligence, but as a preliminary proposition the burden of proof was upon the plaintiff to satisfy the jury, by a fair preponderance of evidence, that the fire was set by Stanchfield. The jury found affirmatively upon this proposition and their finding is not seriously contested at this time. It was also encumbent upon plaintiff to satisfy the jury by a fair preponderance of the evidence, (1) that the conduct of Dr. Hedin with reference to the enlargement of Stanchfield was negligent, (2) that no negligence on the part of the plaintiff contributed to the resulting injuries, (3) the casual relation between the negligence of Dr. Hedin and the damages sustained by the plaintiff, (4) the amount of the damages.

Contributory negligence on the part of the plaintiff is not claimed and the causal relation between the enlargement of Stanchfield and the setting of the fire hardly admits of argument, for if Stanchfield had not been enlarged he would not have had the opportunity to set the fire. If the fire had not been set the damages would not have occurred. The real contest, as to the facts involved, centers around the question of Dr. Hedin's negligence and the amount of the damages.

## NEGLIGENCE.

As defined by one of the ablest elementary law writers of modern times, and approved by the Supreme Court of Michigan, in *Kendrick* v. *Towle*, 60 Mich., 363, 1 Am. St. Rep., 526, "Negligence consists in the failure to observe that degree of care which the law requires for the protection of the interests likely to be injuriously affected by the want of it." Our own court has thus defined the word in *Davis* v.

*Winslow,* 51 Maine, 264; "Negligence consists in the omitting to do something that a reasonable man would do, or in doing something that a reasonable man would not do, causing, unintentionally, mischief to another."

The statistical data relative to the admission of Stanchfield to the hospital shows that this formality occurred on February 15, 1920, and that the psychosis, as shown by the record, was dementia praecox, paranoid type (manic depressive, manic type). At the staff meeting held February 27, 1920, Dr. Hammond diagnosed the case as one of dementia praecox, paranoid type. Dr. Goodrich said, "If there is any such thing as paranoia, or if we are to make anything of this classification, I think he ought to be put in this group." Dr. Janjigian said that the patient presented more characteristic symptoms of dementia praecox, of paranoid type, but was not fully satisfied that the patient really belonged to that group. Dr. Norris said, "In this case I agree that he is paranoid dementia praecox; quite a typical case." Dr. Hedin was uncertain whether the mental ailment was dementia praecox, paranoid type, or manic depressive insanity, but thought the symptoms were more in favor of dementia praecox. That he was insane seems to be beyond question. It also seems to be well established that the patient's condition was accompanied by delusions of persecution. Under a long line of decisions supported by well-recognized authorities, in a note found in connection with *Westerland* v. *First National Bank,* 38 N. D., 24; 164 N. W. 323; 7 A. L. R., 588, a person adjudged to be insane is presumed to continue as such until it is shown that sanity has returned.

The report of the patient's condition, signed by Dr. Hedin, dated April 2, 1920, shows "There has been no change in this patient's condition since the date of presentation. . . . . Physically he is in excellent condition. Mentally there has been no change. He still clings to the delusions which he expressed at the time of coming here and it is impossible to convince him that they are not true." On April 24, 1920, the patient escaped from the congregate dining-room between six and seven o'clock in the morning. Attendants were sent to search for him but were unable to find him. On April 26, 1920, the patient's mother visited the hospital and gave information as to his wanderings and his arrival at her home on the preceding evening. Under date of April 26, Dr. Hedin's record shows "She returned the patient to the hospital last evening, and upon being

returned from escape, and upon the patient's mother's application he was paroled into her custody, condition improved." The acceptance of the patient on parole, by his mother, is dated April 25, 1920. Six months later, October 25, 1920, we find this record made by Dr. Hedin: "This patient having been committed to the criminal department of the Augusta State Hospital, and his parol from this institution having expired, he is today discharged from this hospital's record, condition unimproved." Stanchfield was committed to the Augusta Hospital for observation as to his sanity on July 19, 1920, by order of the Justice of the Superior Court, pending an accusation charging him with arson. He was returned to the custody of the officers in Penobscot County on October 15, 1920, the medical staff of the Augusta Hospital agreeing that the diagnosis of the patient's trouble was dementia praecox, paranoid type. We regard the fact as sufficiently established that from February 15, 1920, to October 15, a period of six months, which included the date of Stanchfield's enlargement on parol, he was continuously suffering from dementia praecox, paranoid type, accompanied with delusions of persecution. Was Dr. Hedin negligent in granting parole under these conditions? In other words did he fail "to observe that degree of care which the law requires for the protection of the interests likely to be injuriously affected by the want of it?" It should not require argument or citation of legal authorities to prove the necessity and propriety of the various methods provided by law to protect both the afflicted person and the community at large from the ill effects of insanity. Among those methods is that of restraint by lawful commitment to a hospital provided for the custody and treatment of the insane. While the statute law provides that the superintendent of an insane hospital may permit any inmate thereof to leave such institution temporarily in charge of his guardian, relative, or friend, or even by himself, for a period not exceeding six months, yet reason and good sense demand that such permission should not be given if the safety and welfare of the patient, or the community at large, are to be jeopardized by such permission. And it equally follows that the degree of care to be exercised in giving such permission should be commensurate with the particular nature of the patient's mental affliction and the possible or proportionate risk consequent upon his enlargement. It would be unprofitable, and perhaps invidious, to discuss the professional opinions of the distinguished medical men who testified at the trial.

From their testimony, and from all the testimony in the case, the jury passed upon the issue of negligence. There was evidence, if credible to the minds of the panel, to sustain the view that Stanchfield was a dangerous man to be at large; that a reasonably prudent man, possessing the learning, and having had the experience, which were possessed and had by Dr. Hedin, would not have paroled Stanchfield after so short a term of confinement, when he was suffering from a mental ailment which made him a dangerous man to be at large, and without more critical and careful examination of the patient's condition at the very time when parole was granted. Parole under these circumstances, must be regarded as an abuse of discretion. To be sure it was the verdict of laymen upon a question largely affected by professional learning, but it was a question of fact to be determined by a jury, under our judicial procedure, and we are not convinced that their finding should be disturbed by this court.

DAMAGES.

The verdict is large but the loss is great. The elements of damage included destruction of buildings, of cattle, and of other personal property. Damages were also claimed for loss of profits in connection with an established milk route. All these are elements of actual damages and we are not disposed to disturb the sound judgment of practical men, sitting in the jury box, upon these elements of damage. But apparently the verdict included damages claimed for loss of prospective value of the young stock by reason of the destruction of the older members of the herd which, if allowed to live, would by dairy record, or record of progeniture, enhance the value of the younger stock. This we regard as coming within the rule of speculative damages and as such are not recoverable. The sum thus included appears to be about five thousand dollars. The mandate will be,

*Exceptions overruled.*
*If plaintiff, within thirty days after*
   *receipt of rescript, remits $5000*
   *from the verdict, then motion over-*
   *ruled, otherwise, motion sustained*
   *and new trial granted.*