(No. 4056—

MARY MALLOY, Claimant, *vs.* STATE OF ILLINOIS, Respondent.

*Opinion filed February 24, 1949.*

THOMAS J. DOWNS, JOHN D. O'CONNOR, AND MEARL G. ADAMS, Attorneys for Claimant.

HON. GEORGE F. BARRETT, Attorney General; WILLIAM J. COLOHAN, Assistant Attorney General, for Respondent.

DAMRON, J.

On November 1, 1946, Miss Mary Malloy, claimant, was brutally attacked, beaten and stabbed by one, William Payne, an escapee from the Illinois Security Hospital, Menard, Illinois, an institution for the insane operated by respondent. The attack occurred about eleven o'clock in the morning when claimant was alone in her gift shop at 6846 Wentworth Avenue, Chicago, Illinois. The assailant, Payne, a stranger, had previously visited the store and made a small purchase about five or ten minutes earlier when another customer was present. At the time of his second visit he seemed to be normal and unexcited. He asked: "Just give me

two more cards''. As claimant handed him his change he suddenly grabbed her by the throat and struck her. Claimant had given Payne no reason or provocation; she acted in the exercise of due care and caution for her own safety and in a normal manner. Payne then grasped a scissors from its place on the counter. Saying he was going to kill her, he dragged claimant back of the counter and through a curtained doorway leading into the living quarters at the rear of the store. He pulled her into the bathroom, and pounding her head against the wall, stabbed her with the scissors. A customer entered the shop. As claimant lost consciousness, the customer, hearing the struggle and groans, gave alarm. Payne was captured soon after he fled from the store.

Claimant, unconscious and bleeding from her wounds, was taken to St. Bernard's Hospital, Chicago, Illinois, where she remained two weeks. She was under the care of Dr. Howard J. McNally, a member of the hospital staff as well as of St. Elizabeth and Mercy Hospitals in Chicago. Dr. McNally, who attended her every day, testified:

"Patient entered the hospital in shock and received anti-shock treatment in the form of two blood transfusions, morphine; and had certain wounds. There was considerable swelling of the entire left side of the face, completely closing the left eye. Swelling involved the nose, right side of the face, and also the neck area. Multiple lacerations were present on the face, neck and chest. One laceration penetrated the bony region below the ocular bulb. There was a laceration on the left side of the mouth. There was one laceration in the neck and was characterized by swelling. X-rays were taken at that time which indicated no bony penetrations of the head, neck or chest, but indicated a displacement of the trachea to the right side. Lacerations of the chest did not penetrate the chest cavity. Eye consultation was held at that time and the doctor believed that the orbit had not been penetrated, but there was considerable hemorrhage within it."

The scars shrank so as not to be noticeable or constitute any sort of disfigurement. Claimant, however,

suffered permanent injury to her left eye. The left eye was so torn that the nerves controlling its function of turning in different directions were severed. Thus, claimant cannot use both eyes together without seeing a double image. The evidence on behalf of claimant further shows that as a result, she must use spectacles with the left glass opaque to prevent the use of that eye. The medical, surgical and hospital expense paid by claimant as the result of her aforesaid injuries totalled $620.32. Including time in the hospital, claimant was incapacitated and away from her business about three weeks.

The complaint, as amended, alleges that on April 6, 1942, William Payne was committed to the aforesaid hospital as criminally insane after he had killed one Mrs. Amalie Fanti, a woman proprietor of a toy shop. The long criminal record of William Payne, under various aliases, is set forth from his first sentence to the Chester, Illinois, Penitentiary in 1908 for burglary and larceny. This record includes many convictions in five states on numerous charges relating to burglary, larceny, robbery, carrying concealed weapons, and murder. In 1938, William Payne was confined in the ward for the criminally insane at the State penitentiary at Anamosa, Iowa. The complaint alleges the respondent had knowledge or by the exercise of ordinary care could have learned of the dangerous character and criminal record of William Payne. The complaint alleges the respondent, contrary to its duty to claimant as well as the public at large with respect to the dangerous inmates, maintained and controlled the aforesaid hospital in a negligent manner in that it did or omitted to do one or more of the following:

"(A) Permitted said inmate, William Payne, his liberty without adequate guard and surveillance.

(B) Permitted said William Payne to take charge of a chicken farm away from the principal buildings and guards of the hospital.

(C) Permitted its charge, William Payne, to escape from said hospital.

(D) That the respondent failed to discover the escape of their charge, William Payne, on October 1, 1946, and that the respondent did not know of said William Payne's escape until several days after October 1, 1946."

It is further alleged that by reason of the aforesaid assault committed on the claimant, she suffered personal injuries and damages including the loss of income, medical and hospital expenses exceeding $2,500.00.

The evidence presented by the respondent constituted the departmental report of the Department of Public Welfare dated May 11, 1948, signed by Cassius Poust, director, together with the exhibits referred to in said report. In this report it is stated:

"6 (a) The management did not permit William Payne his liberty without guard or supervision. Payne was not a trusty but under supervision of a guard and within sight except for a short time occasionally when he would be working within the chicken house. The officer in charge inspected the chicken house and premises and directed the work several times daily and maintained a regular check.

"6 (b) The management did not permit William Payne his liberty without guard, surveillance and supervision as is customary under the general practice accepted in an institution of this type. The chicken house is approximately 100 yards from the principal buildings. There is no obstruction of view and it is in plain sight of the officer in charge at all times.

"October 1, 1946, patient walked away from the chicken house on this date. Was last seen at 3:30 P.M. but when supper count was made at 4:00 P.M. patient was absent. Intensive search conducted throughout the night of the 1st and during the day and night of the 2nd. Pictures and description furnished State police and police of all surrounding districts and principal towns between here and Chicago and towns south as far as Cairo.

Martin."

141

Prior to the Act creating the present Court of Claims in 1945, it was held the doctrine of respondeat superior did not apply to the State of Illinois in the exercise of a governmental function and that the State was not liable for injuries resulting from the malfeasance, misfeasance, or negligence of its officers, agents or employees. *Helen Turner, Admix.,* vs. *State of Illinois,* 12 C.C.R. 265; *Brookshier* vs. *State of Illinois,* 14 C.C.R. 134. However, this rule of immunity of the State was expressly abolished by the present Act to the extent necessary for the exercise by the Court of the limited jurisdiction in tort cases provided for in Section 8, Paragraph C of the Act reading as follows:

"All claims against the State for damages in cases sounding in tort, in respect of which the claimants would be entitled to redress against the State of Illinois, at law or in chancery, if the State were suable, and all claims sounding in tort against the Board of Trustees of the University of Illinois; provided, that an award for damages in a case sounding in tort shall not exceed the sum of $2,500.00 to or for the benefit of any claimant. The defense that the State or the Board of Trustees of the University of Illinois is not liable for negligence of its officers, agents, and employees in the course of their employment shall not be applicable to the hearing and determination of such claims."

The first question under the evidence offered in behalf of claimant is whether the respondent owed a duty of due care in relation to the claimant. Generally, in the law of negligent liability in tort, this question is resolved by whether it would have been reasonably foreseeable to a normally prudent man in the place of the defendant that the defendant's conduct would be so careless as to constitute a probable cause of harm to the plaintiff. At 38 American Jurisprudence 656, it is stated:

"The law imposes upon every person who undertakes the performance of an act which, it is apparent, if not done carefully, will be dangerous to other persons or the property of other persons, the duty to exercise his senses and intelligence to avoid injury, and he may be held accountable at law for an injury to person or to property which

142

is directly attributable to a breach of such duty. The duty so arising is absolute".

and at page 661, it is stated:

"The duty to use care . . . is an indispensable element of actionable negligence, may be a duty owing to an individual by reason of his peculiar position, or it may be general and owing to everybody".

In *Jones Company* vs. *State* (1923), 122 Me. 214, certain buildings and personal property owned by the plaintiff were destroyed by fire. The arsonist was an insane patient who had been paroled by the State. The jury, from medical testimony, found the State had been negligent and to have abused its discretion in paroling the insane arsonist, a dangerous man to be at large. The suit was authorized by a statutory provision comparable to the case at hand and expressing: "The liabilities of the parties shall be the same as the liabilities between individuals". In its opinion the Supreme Court of Maine said (at page 125):

"Was Dr. Hedin (the superintendent) negligent in granting parole under these conditions? In other words did he fail 'to observe that degree of care which the law requires for the protection of the interests likely to be injuriously affected by the want of it?' It should not require argument or citation of legal authorities to prove the necessity and propriety of the various methods provided by law to *protect both the afflicted person and the community at large from the ill effects of insanity.* Among those methods is that of restraint by lawful commitment to a hospital provided for the custody and treatment of the insane. While the statute law provides that the superintendent of an insane hospital may permit any inmate thereof to leave such institution temporarily . . . yet reason and good sense demand that such permission should not be given if the safety and welfare of the patient, or the community at large, are to be jeopardized by such permission. And it equally follows that *the degree of care to be exercised in giving such permission should be commensurate with the particular nature of the patient's mental affliction and the possible or proportionate risk consequent upon his enlargement.*" (Italics ours.)

Persons afflicted with highly contagious diseases, dangerous to human life, are quarantined as necessary to afford protection to the community where they are

found. In part, for the same reason, are the criminally insane kept in charge. The respondent took charge of William Payne, dangerous, criminally insane and a person likely to cause bodily harm to others if not controlled. The respondent was under a duty to exercise due care in such control so as to prevent him from causing such harm to members of the public, including the claimant. In this connection see Restatement of the Law of Torts, Section 319, and the second illustration stated thereunder.

The aforesaid duty existing, was the respondent negligent in its discharge? Respondent admits that Payne, the insane escapee, was working at a chicken house outside and at least 100 yards away from the main institutional buildings of the Illinois Security Hospital. Respondent, while generally claiming to have inspected the chicken house, to have directed the work, and to have maintained a regular check, provides no facts of the method of such inspection, direction and check whereby the adequacy of its security procedure may be measured in light of its duty of guard and supervision of Payne, dangerous and criminally insane. Respondent admits Payne, in escaping, merely walked away, further, that his absence was not known until a supper count at least a half hour later.

In *Arado* vs. *Eppstein* (1944), 323 Ill. App. 194, the Court stated (at pages 199 and 200):

"It is a very ancient and salutary principle of law, that where one has charge or management of a thing in connection with which an accident happens, which in the ordinary course of things does not happen if those who have the management use proper care, it affords reasonable evidence, in the absence of explanation by the defendant, that the accident arose from a want of proper care; that in case of such an accident the duty of explanation is thrown upon those having charge of the thing, particularly when information concerning the thing itself is within the particular or peculiar knowledge of the defendant."

To the same effect see *Johnson* vs. *Stevens Bldg. Catering Co.* (1944), 323 Ill. App. 212, 217, where the Court adds:

"The doctrine is also based on the further consideration that where the control of the thing which has caused the injury is exclusively in the defendant it is within his power to produce evidence of the actual cause, which the plaintiff is unable to present."

The respondent had the exclusive control and management of the Illinois Security Hospital and the security measures applicable to inmate Payne. We may observe, the more dangerous the character of Payne, the more diligent is the duty and standard of care required of respondent. It is believed the doctrine of res ipsa loquitur is applicable here in judging the respondent's performance of its duty of due care in the guard and supervision of inmate Payne. Viewing the evidence in light of such doctrine it is found that it would have been reasonably foreseeable to a normally prudent management in the place of the respondent that the respondent's conduct of guard and supervision and control of inmate Payne was so careless as to constitute a probable cause of harm to the claimant. Respondent violated its duty of care owned in relation to the public, including claimant.

The injuries and damages to claimant hereinabove set forth were substantially caused by the respondent's negligence. But for the negligence the claimant would have suffered no harm. No new element contributes to her harm additional to the existing factors of the situation under which the respondent's conduct we deem was negligent. The injuries suffered by claimant could have been prevented by the duty of care which the defendant violated.

The evidence in this case was heard by Commissioner Burton H. Young, who has reported to this Court that

this claimant suffered damages to an amount exceeding $2,500.00.

On the basis of this record and under the provisions of Paragraph C, Section 7 of the Court of Claims Act, an award of $2,500.00 is not an unreasonable sum to allow claimant for damages sustained as a result of these injuries.

An award is therefore hereby entered in favor of Mary Malloy in the sum of Two Thousand Five Hundred Dollars ($2,500.00).