MR. JUSTICE HARRISON
dissenting.
I dissent, I am aware of the difficult problem faced by the majority, and perhaps the solution presented is the only one available. However, the time has come to focus on the absurd positions that courts are now put in when interpreting the mental condition of defendants in trying to determine their criminal liability.
Appellant, as noted in the opinion of the majority and in a prior case before this Court, is a know rapist. Prior to, and noted in our opinion in State v. Olson (1971), 156 Mont. 339, 480 P.2d 822, he was charged with an assault in a county adjacent to Lincoln County and allowed to plead to a lesser offense. The testimony of defense psychiatrists in the above case indicated that he was entitled to the provisions of section 46-14-101 through 46-14-304 MCA (formerly section 95-501 through 95-509, R.C.M. 1947). Dr. Wetzler indicated that he was a dangerous person who had:
“. . . a grave defect, a grave illness, a serious problem of his inability to accept his own sexual feelings any more than you or I can perhaps accept or control hunger ... I cannot predict the outlook. I would say it would be a grim and guarded one . . . Because of the long duration of his illness and particularly as we are again dealing with a personalities weakness, a personality defect... Because he is dangerous to be at large. He has no control at times. This is what we are talking about, his control, his defect, his illness. If he has shown these manifestations since 12, 14 years of age, and he is now what, 27, 28, plus evidence of the Minnesota Multiphasic Test, we have conclusive proof that this man needs to be confined.”
With this testimony before the court and available later for consideration by attending psychiatrists, and with little or no treatment at the State Hospital during the year he spent there, we now have testimony before us that he should have never been sent to the State Hospital. If that is true, fraud was perpetrated on the court when it found appellant not guilty by reason of insanity. Had the *338 trial court not accepted this testimony, appellant would have faced retrial and could have been convicted and sentenced to a long term in the State Prison — from which escape is considerably more difficult than it is from the State Hospital.
In addition I am distrubed that a patient at the State Hospital "designated as dangerous” can walk away from that institution with no notification to the committing authorities, or to any of the law enforcement authorities in the State. The result is that we have such a person at large in the State for a five-year period. Somewhere in this case, we have a complete breakdown of responsibility to the people of this State. They are entitled to more protection — particularly the women of this State — than has been exhibited here. Failure on the part of the State Hospital authorities to notify law enforcement officials evidences, in my opinion, gross negligence and reckless disregard for the rights and safeguard of the public.
As a result of such actions by state officials in other jurisdictions, persons injured by such inmates, or their survivors, are seeking redress against the state for injuries done by the inmate while at large. 2 Restatement of Torts 2d gives guidance on the issue of the duty owed any members of boards or the responsible officials at institutions who release such persons. Section 319, “Duty of Those in Charge of Person Having Dangerous Propensities” states:
“One who takes charge of a third person whom he knows or should know to be likely to cause bodily harm to others if not controlled is under a duty to exercise reasonable care to control the third person to prevent him from doing such harm.”
The illustrations to Section 319 involve the negligent release of an infectious patient from a private hospital with an infectious disease (based, inter alia, on Missouri, K & T.R. Co. v. Wood (1902), 95 Tex. 223, 66 S.W. 449) and the escape of a homicidal maniac patient due to the negligence of guards employed by a sanitarium (based, inter alia, on Austin W. Jones Co. v. State (1923), 122 Me. 214, 119 A. 577).
The State asserts it used Wetzler’s 1970 testimony because *339 Wetzler was out of state, residing in the State of Washington, where he has his practice, and was therefore not available to testify. In fact, Dr. Wetzler has retired and his records are not available at this time.
I believe the transcribed testimony was clearly admissible under section 95-1802(e),’R.C.M. 1947, now section 46-14-204 MCA, which provides that the sworn transcribed testimony of a witness, that the defendant has been able to cross-examine, is admissible if the witness is out of the state. State v. LaCario (1974), 163 Mont. 511, 518 P.2d 982; State v. Bouldin (1969), 153 Mont. 276, 456 P.2d 830; and State v. Zachmeier (1969), 153 Mont. 64, 453 P.2d 783.
As to the presumption of continuing insanity, Montana recognizes the common law presumption that insanity, once proved, is presumed to exist. Appellants’ assertion that the presumption ends after five years is wholly unfounded. Presumption must be judged on a case-by-case basis; the inference steadily diminished in force with the lapse of time at a rate proportionate to the quality of the permanence belonging to the thing in question until it ceases. Sommer v. Wigen (1936), 103 Mont. 327, 62 P.2d 333; People v. Baker (1954), 42 Cal2d 550, 268 P.2d 705; State v. Garver (1950), 190 Or.291, 225 P.2d 771.
The State was required to prove that Olson’s insanity was permanent and continuing. Wetzler’s testimony clearly went to that question. The State was not trying to pass the testimony off as evidence of Olson’s condition at the time of the hearing but as testimony concerning Olson’s former condition which was to serve as an explanation of his current actions.
Olson was diagnosed in 1970 as having a mental problem of long standing for which he was ordered to be confined and treated. Yet one year after his commitment, Olson escaped from Warm Springs and for the five years between 1972 and 1977 received no treatment. Thus, apellant has been essentially untreated for this grave illness; a presumption that it continues is appropriate.
The State does not believe that the original testimony on insanity *340 is always sufficient to keep the person confined. It was the combination of Wetzler’s testimony, the attack on White, and the fact that Olson had received no treatment which made the State’s case.
As to the use of Karla White’s testimony, there was substantial similarity between the 1969 rapes committed by Olson, the 1977 attack on White, and the 1976 appearance by Olson in White’s bedroom. While no sexual assault took place, there may have been one had not the police intervened in one incident or White not had a male companion in the other.
The 1969 rapes took place at night when the victims’ husbands were away and after Olson had threatened to harm their children. The attack on White also occurred at night, and appellant had inquired as to the whereabouts of her child and husband.
Olson was required to prove that he was entitled to release by a preponderance of the evidence. Appellant produced evidence that he is not mentally ill and that he has adjusted to community and family life. The State, on the other hand, produced evidence that appellant was diagnosed in 1970 as having a grave and serious mental illness, that he had raped two women in 1969, and that he had perpetrated an attack upon a woman in 1977 that was similar, as far as it went, to the earlier rapes. The evidence also showed that appellant had received essentially no treatment for his mental illness. Upon this record, the District Court was entirely justified in determining, as it did, that appellant had not shown an entitlement to release by a preponderance of the evidence.
Even ignoring the transcript of Wetzler’s testimony, the evidence shows that Olson was a physical danger to others in 1970 and remained so in 1977. As stated in the Revised Commission Comment to section 95-508, R.C.M.1947, now sections 46-14-301 through 46-14-304 MCA:
“. . . It seems preferable to make dangerousness the criterion for continued custody rather than to provide that the committed person may be discharged or released when restored to sanity as defined by the mental hygiene laws. Although his mental disease may have greatly improved, such a person may still be dangerous *341 because of factors in his personality and background other than mental disease. Also, such a standard provides a possible means for the control of the occasional defendant who may be quite dangerous but who successfully feigned mental disease to gain an acquittal ...”
This comment is particularly appropriate in the present case based on White’s uncontroverted testimony.
I would affirm the District Court.