[Crim. No. 15842. In Bank. May 12, 1972.]

In re ROBERT GUY FRANKLIN on Habeas Corpus.

130

## COUNSEL

Richard S. Buckley, Public Defender, James L. McCormick, Joel S. Peck and Dennis A. Fischer, Deputy Public Defenders, for Petitioner.

Evelle J. Younger, Attorney General, William E. James, Assistant Attorney General, and Edward T. Fogel, Jr., Deputy Attorney General, for Respondent.

## OPINION

**BURKE, J.**—In this case we are called upon to determine the constitutionality of the procedures (Pen. Code, §§ 1026, 1026a) for the commitment

and release of persons who, following trial for a criminal offense, are acquitted by reason of their insanity. We have concluded that these procedures, whereby such persons may be confined in a state hospital for a minimum period of 90 days pending a hearing on the question whether they should be released to society, fulfill the requirements of due process and equal protection of the laws and should be sustained. In particular, we hold that the 90-day prehearing commitment period under section 1026a is reasonably necessary to provide a minimum opportunity for institutional observation and examination regarding the patient's present sanity, and that thereafter the patient is entitled to a full jury hearing on the question whether he has recovered his sanity and is no longer a danger to the health and safety of himself or others.

On May 6, 1971, in the Los Angeles Superior Court, petitioner Franklin was found not guilty by reason of insanity of violating Penal Code section 148.1 (false bomb report), following a trial by the court upon the transcript of the preliminary hearing and other documentary evidence, including two psychiatric reports.[1] The evidence disclosed that petitioner had committed the offense in question on February 14, 1971, by making two calls to telephone operators and announcing that a bomb was set to "blow up" the Veterans Administration Hospital. Shortly thereafter, petitioner called the Los Angeles Police Department and, according to the officer, stated that "he was all messed up, that he was the person who had placed the call to the General Telephone Company in Long Beach, faking a bomb threat of the V.A. Hospital." The officer talked petitioner into coming to the police station, where he admitted making the calls; petitioner did not appear to be intoxicated. After being advised of his rights, petitioner stated that he had not planted a bomb in the hospital, that he had once been a patient there and that "he only wanted to scare them."

Petitioner was arrested and driven to the Long Beach Police Department. According to the transporting officer, petitioner told him "that now, with a clear conscience, he could do what he wanted to do and he stated that he was an ex-Marine, an expert sniper and that he was going to take my life."

Two psychiatrists examined petitioner. Dr. Deering submitted a two-and-one-half-page report concluding that petitioner, though an "emotional, unstable personality," was legally sane at the time of the commission of the offense. The report noted, however, that petitioner "was deeply depressed,

---

[1]Petitioner pleaded not guilty and not guilty by reason of insanity. At trial, he personally and through counsel waived trial by jury, and the question of guilt was submitted by stipulation on the preliminary hearing transcript and investigative reports. The court found petitioner guilty as charged of violating Penal Code section 148.1, but not guilty by reason of his insanity at the time the offense was committed.

intoxicated with alcohol and in a panic state." According to Dr. Deering, at the time of the offense petitioner did not have the mental capacity to meaningfully and maturely reflect upon the gravity of his contemplated acts, to deliberate, premeditate or harbor malice. Dr. Bailey, in an 11-page report, found petitioner to be in an anxious and depressed state and in "disharmony with his environment and is unstable." Dr. Bailey concluded that petitioner was legally insane at the time of the offense, that his conduct constituted a "call for help on a psychiatric basis," that he had not yet fully recovered his sanity,[2] that he "is still a menace to the health and safety of others and to himself," that he presently understands the nature and purpose of the proceedings against him and is able to cooperate with counsel in his defense, and that he would benefit from care and treatment in a state hospital.

Following trial, the court found petitioner guilty of violating section 148.1, but also found (on the basis of Dr. Bailey's report) that petitioner was insane when the offense was committed. The court further stated that, in view of Dr. Bailey's report, "there is no basis upon which I can make any finding he [petitioner] has presently recovered his sanity . . . ." Accordingly, the court ordered petitioner remanded to the custody of the sheriff to be delivered to a state hospital for the insane. Petitioner was committed to Atascadero State Hospital, where he presently remains. Petitioner now seeks habeas corpus for his release, challenging the validity of his original commitment.

The statutory procedures for the confinement and release of persons, such as petitioner, who are acquitted of criminal offenses by reasons of insanity are set forth in Penal Code sections 1026 and 1026a. Section 1026 provides in pertinent part, as follows: "If the verdict or finding be that the defendant was insane at the time the offense was committed, the court *unless it shall appear to the court that the defendant has fully recovered his sanity* shall direct that the defendant be confined in the state hospital for the criminal insane, or if there be no such state hospital, then that he be confined in some other state hospital for the insane. If, however, it shall appear to the court that the defendant has fully recovered his sanity such defendant shall be remanded to the custody of the sheriff until his sanity shall have been finally determined in the manner prescribed by law. A defendant committed to a state hospital shall not be released from con-

---

[2]Dr. Bailey stated that "The experience which he [petitioner] had in service is still lurking in a residual psychopathy, a severe somatization reaction in his gastrointestinal system (made much worse by alcohol), and he is still afflicted with insecurity and depression. This psychopathy aggravates his drinking and is, in turn, aggravated by his drinking."

finement unless and until the court which committed him, or the superior court of the county in which he is confined, shall, after notice and hearing, find and determine that his sanity has been restored." (Italics added.)

Section 1026a provides: "An application for the release of a person who has been committed to a state hospital, as provided in Section 1026, upon the ground that his sanity has been restored, may be made to the superior court of the county in which he is confined or of the county from which he was committed, either by such person or by the superintendent of the hospital in which the said person is confined. *No hearing upon such application shall be allowed until the person committed shall have been confined for a period of not less than 90 days from the date of the order of commitment.* If the finding of the court be adverse to releasing such person upon his application for release, on the ground that his sanity has not been restored, he shall not be permitted to file a further application until one year has elapsed from the date of hearing upon his last preceding application. *In any hearing authorized by this section the burden of proving that his sanity has been restored shall be upon the applicant.*" (Italics added.)

Thus, to summarize the commitment and release procedures set forth in sections 1026 and 1026a, unless the trial court finds that the person acquitted by reason of insanity has fully recovered his sanity, that person must be committed to a state hospital for the insane for a minimum period of 90 days prior to any further hearing regarding the restoration of his sanity. Thereafter, a release hearing may be held upon the application of the hospital authorities or the patient himself, with the burden upon the applicant to prove restoration of sanity. Petitioner herein contends that the foregoing procedure is invalid, denying him due process and equal protection of the laws, in that this procedure deprived him of an immediate, pre-commitment jury hearing on the question of his present sanity, with the burden of proof upon the People to establish that he continues to be insane. As we shall explain, however, constitutional principles do not forbid prehearing confinement for a reasonable period of persons such as petitioner for the purpose of immediate institutional observation and examination of their mental condition. The availablity, under section 1026a, of a full jury hearing following a 90-day period of institutional observation satisfies the demands of due process,[3] and petitioner's status as a person

---

[3]The People have contended that the instant petition should be dismissed as moot, since petitioner now has the opportunity of applying for his release under section 1026a. It is apparent to us, however, that were we to dismiss the petition, we might

found, by a preponderance of the evidence, to have been insane when he committed a criminal offense affords a rational basis for treating petitioner differently than other persons sought to be committed to mental institutions in this state.

A recent study indicates that the statutes in 15 states provide for the automatic, mandatory commitment of persons acquitted by reason of insanity, 30 states (including California) provide for such commitment at the discretion of the trial court or following a summary inquiry into the person's present mental condition, and only a "handful" of states[4] are required by statute to initiate and pursue the general civil commitment procedure in order to commit such persons. (Note, 116 U.Pa.L. Rev. 924, 925, and fns. 1-3.)

It is noteworthy that the framers of the Model Penal Code have recommended an automatic commitment procedure more restrictive than the California system. Under section 4.08, subdivision (1), of the code, one acquitted because of "mental disease or defect excluding responsibility" is automatically committed to the custody of a commissioner of public health or mental hygiene, to be placed in an appropriate institution for custody, care and treatment.[5] Although the person so committed may apply for his release, "no such application by a committed person need be considered until he has been confined for a period of not less than [six months] from the date of the order of commitment, and if the determination of the Court be adverse to the application, such person shall not be permitted to file a further application until [one year] has elapsed from the date of any preceding hearing on an application for his release or discharge." (§ 4.08, subd. (5).) The code comment explains that brackets were used around the words "six months" and "one year," in view of the fact that such time limits are "arbitrary." (Model Penal Code, § 4.08, Proposed Official Draft 1962, at p. 77.) However, the commentators also state that "Applications by the patient [for release from commitment] are limited by what is thought to be the period necessary to observe him initially (six months) and by the

---

never have occasion to reach the important questions presented herein regarding the validity of prehearing commitment under section 1026. "We should, of course, avoid advisory opinions on abstract propositions of law. [Citations.] But we should not avoid the resolution of important and well litigated controversies arising from situations which are 'capable of repetition, yet evading review.' [Citations.]" (*In re William M.*, 3 Cal.3d 16, 23, fn. 14 [89 Cal.Rptr. 33, 473 P.2d 737].)

[4]E.g., Wyoming and Arizona. A Louisiana provision applies only to misdemeanor offenses, and Tennessee has no specific provisions governing commitment of persons acquitted as insane. (Note, *supra*, 116 U.Pa. L. Rev. at p. 924 and fn. 1.)

[5]Unlike section 1026 of the California statute, the Model Penal Code makes no provision for a preliminary determination by the trial court regarding defendant's present sanity.

interval probably necessary for a significant change in his conditon to occur after any application has been denied (one year)." (Model Penal Code, § 4.08, comment (Tent. Draft No. 4 1955), at pp. 200-201.)

Thus, in contrast to the 90-day prehearing period set forth in section 1026a of the California act, the Model Penal Code recommends a six-month observation period before an application for release may be heard. ■ As will become apparent from a review of the authorities, constitutional principles do not prohibit the automatic commitment of a person acquitted by reason of insanity, so long as the prehearing commitment period extends no longer than reasonably necessary for institutional examination of his mental condition, and thereafter reasonable opportunity is provided for a full hearing on the question whether he should be released to society. Thus, the ultimate question for decision herein is whether California's 90-day provision is so unreasonable or arbitrary as to constitute a denial of due process and equal protection of the laws.

Before we address that particular question, it is appropriate to reiterate the general constitutional principles which must guide our determination. ■ With respect to due process, we recently pointed out in *Thorn* v. *Superior Court*, 1 Cal.3d 666, 673 [83 Cal.Rptr. 600, 464 P.2d 56] (upholding the constitutionality of the Lanterman-Petris-Short Act, Welf. & Inst. Code, § 5000 et seq., pertaining to involuntary civil commitment), "What is due process depends on circumstances. It varies with the subject matter and the necessities of the situation. [Citation.] Its content is a function of many variables, including the nature of the right affected, the degree of danger caused by the proscribed condition or activity, and the availability of prompt remedial measures." ■ As for the principle of equal protection of the laws, we recently stated in *In re Gary W.*, 5 Cal.3d 296, 304 [96 Cal.Rptr. 1, 486 P.2d 1201] (requiring a jury hearing before a Youth Authority ward may be confined for treatment, pursuant to Welf. & Inst. Code, §§ 1800-1803, for a period beyond the date on which his release would otherwise be mandatory), that "although the procedures leading to the commitment of various classes of people for treatment or to protect society from them need not be identical in all respects, none may deny to one such class fundamental rights or privileges accorded to another unless a rational basis for the distinction exists."

In 1930 this court examined and affirmed the validity of California's commitment procedure under section 1026. (*In re Slayback*, 209 Cal. 480 [288 P. 769].) In *Slayback*, the court first ruled that section 1026 cannot be interpreted as requiring a precommitment hearing, unless it first appears to the trial judge that the defendant has regained his sanity. "Nothing

is expressly said about any hearing as to his present sanity before the trial court shall issue the commitment, and we fail to find anything in the section from which it can be inferred or implied that any hearing was contemplated after the verdict of the jury that the defendant was not guilty by reason of his insanity, and before the commitment should issue. We must take the statute as we find it, and have no right to read into it any provision not contained therein." (Pp. 484-485.)

Next the court in *Slayback* flatly rejected the contention that the failure to provide for a precommitment hearing violates the due process clauses of the state and federal Constitutions. In doing so, the court relied upon cases and authorities from other jurisdictions having similar commitment procedures. To summarize the reasoning of these cases, automatic or discretionary commitment is justified for the following reasons: (1) Defendant, having voluntarily submitted the issue of his insanity to the judge or jury, and having been afforded the full range of his constitutional rights, was found to have been insane at the time of his offense. (2) Defendant's past insanity reasonably may be presumed to continue to the date of his acquittal, justifying immediate confinement (for the protection of defendant and the public) until his sanity has been restored and he may safely be released to society. (3) Confinement, without further hearing, may continue for a reasonable period "to permit a sufficient length of time to elapse to enable those who may be called upon to pass upon the sanity of the patient to intelligently give their judgment as to whether or not he has recovered his reason." (Pp. 485, 491.)

█ Thus, as indicated in *Slayback,* the purpose of prehearing confinement is not to punish the defendant but to protect him and the general public during the period necessary to appraise his present sanity. At the time *Slayback* was decided, section 1026a provided that *one year* should elapse before the court could entertain an application for release from commitment. The court noted that "Perhaps a lesser or greater time would serve the same purpose, but the legislature was in as good a position to judge of the time required as are the courts. No definite showing has been made that the time so fixed is an unreasonable time, and as the matter is one primarily for the legislature we see no reason to overturn their action." (P. 491.) In 1957 section 1026a was amended to provide for the present 90-day period before an initial application for release may be considered.

Of the states which have considered the validity of commitment procedures similar to the California scheme, the great majority have upheld their procedures against constitutional attack. (See *Chase* v. *Kearns* (Me. 1971) 278 A.2d 132, 134-138; *State* ex rel. *Schopf* v. *Schubert* (1970)

45 Wis.2d 644 [173 N.W.2d 673, 676-678]; *State* v. *Allan* (Iowa 1969) 166 N.W.2d 752, 760; *Mills* v. *State* (Del. 1969) 256 A.2d 752, 755-758; *Newton* v. *Brooks* (1967) 246 Ore. 484 [426 P.2d 446, 449-450]; *Bailey* v. *State* (1953) 210 Ga. 52 [77 S.E.2d 511, 513-514]; *People* v. *Dubina* (1943) 304 Mich. 363 [8 N.W.2d 99, 102, 145 A.L.R. 886] [cert. den. 319 U.S. 766 [87 L.Ed. 1716, 63 S.Ct. 1331]]; see also *Lynch* v. *Overholser,* 369 U.S. 705, 728 [8 L.Ed.2d 211, 225, 82 S.Ct. 1063]; *Ragsdale* v. *Overholser* (1960) 281 F.2d 943 [108 App.D.C. 308]; Annot. 145 A.L.R. 892 and cases cited.)

The most recent of the cases which have considered the question is *Chase* v. *Kearns, supra,* 278 A.2d 132, wherein the Supreme Court of Maine unanimously upheld a statute which required immediate commitment of persons acquitted by reason of mental disease or defect excluding responsibility. In *Chase,* the court acknowledged that "Fundamental in the guarantees of due process are the right to notice and hearing. [Citations.]" (P. 134.) However, the court noted "important policy considerations [which] rationally justify the immediate commitment . . . of a person who has been found not guilty by reason of mental disease or mental defect and who has already thus demonstrated his capacity for prohibited conduct brought about by his mental condition." (P. 134.) Next, the court spelled out these considerations, which parallel those enumerated in *Slayback, supra,* namely, that defendant has voluntarily raised the issue of his mental illness, that the jury has found beyond reasonable doubt that defendant committed a criminal offense,[6] that the jury has also found by a preponderance of the evidence that defendant was insane when the offense took place, that society thereupon acquired a "special interest" in defendant justifying the careful determination whether he should be confined or released, and that "It is unavoidable that between the verdict and the determination as to defendant's then existing mental condition a time lapse must occur" in order to provide medical experts a reasonable opportunity to examine defendant. (Pp. 134-135.)

Thus, the court in *Chase* held that "The Legislature has reasonably concluded that the security of the community and the welfare of the individual can best be served if defendant is confined to an institution for the mentally ill during this necessary period of observation (and, if required, of treatment)." (P. 135.) The court noted, however, that the foregoing policy considerations "cannot dispense with the necessity of an adequate

---

[6]In California, such a finding is implicit in a finding of not guilty by reason of insanity. (Pen. Code, § 1016; see *People* v. *Wells,* 33 Cal.2d 330, 349-350 [202 P.2d 53].) In the instant case, petitioner also pleaded not guilty and was expressly found guilty as charged.

release remedy providing opportunity for reasonably prompt hearing as to justification for his detention." (P. 135.)

The court also rejected the contention that Maine's commitment and release procedures denied equal protection of the laws. █ Although differing from the provisions applicable to ordinary civil commitment,[7] the procedures for commitment and release of persons acquitted as insane are based upon a "special" public interest. "[T]he finding by the jury that a defendant, because of his mental disease or defect, shall be held blameless for an act otherwise subject to criminal sanctions *puts such a defendant into an exceptional class.* The special interest which the public has acquired in the confinement and release of people in this exceptional class results from the fact that there has been a judicial determination that they have already endangered the public safety and their own as a result of their mental conditions as distinguished from people civilly committed because of only potential danger. [Par.] We hold that the distinction in commitment and release applying to Petitioner, as a member of this exceptional class, is a reasonable requirement for the protection of the Petitioner and of the public interest." (Italics added, p. 138.)

The conclusion of the court in *Chase* that constitutional considerations do not preclude automatic commitment for a reasonable period of persons acquitted by reason of insanity, provided that adequate opportunity is afforded for a subsequent full judicial hearing on the question of release or discharge, is supported by *every* decision we have examined, including those cases relied upon by petitioner herein. (See, e.g., *State* ex rel. *Schopf* v. *Schubert, supra,* 173 N.W.2d 673, 677-679; *State* v. *Allan, supra,* 166 N.W.2d 752, 760; *Mills* v. *State, supra,* 256 A.2d 752, 755-756; *Bolton* v. *Harris* (1968) 395 F.2d 642, 651 [130 App.D.C. 1]; *Newton* v. *Brooks, supra,* 426 P.2d 446, 449; *People* v. *Lally* (1966) 19 N.Y.2d 27 [277 N.Y.S.2d 654, 224 N.E.2d 87, 91-92]; *Ragsdale* v. *Overholser, supra,* 281 F.2d 943, 948-949.) Moreover, the commentators generally agree. (See Hamann, *The Confinement and Release of Persons Acquitted by Reason of Insanity,* 4 Harv.J.Legis. 55, 61-62; Model Penal Code, § 4.08, comment (Tent. Draft No. 4), at p. 199; Note, 56 Nw.U.L.Rev. 409, 443-445; Note, *supra,* 116 U.Pa.L.Rev. 924, 940; Weihofen, *Institutional Treatment of Persons Acquitted by Reason of Insanity,* 38 Tex.L.Rev.

---

[7]For example, in California persons sought to be confined for so-called post-certification treatment under the Lanterman-Petris-Short Act (Welf. & Inst. Code, § 5000 et seq.) are entitled to an immediate hearing on the question whether they pose "an imminent threat of substantial physical harm to others" as a result of mental disorder. (See Welf. & Inst. Code, §§ 5300-5304; *Thorn* v. *Superior Court, supra,* 1 Cal.3d 666.)

849, 850; Scearce, *Virginia Procedure: Commitment and Release,* 11 Wm. & Mary U.L.Rev. 185, 197-198.)

Petitioner relies heavily upon two cases, *People* v. *Lally, supra,* 224 N.E.2d 87, and *Bolton* v. *Harris, supra,* 395 F.2d 642. It is readily apparent, however, that neither case supports the view that California's commitment procedures are unconstitutional. *Lally* concerned the validity of New York's automatic commitment statute, whereunder persons acquitted as insane are automatically committed to the mental hygiene commissioner for his decision whether to transfer the patient to Matteawan, a high security state hospital for the criminally insane, or to another civil state hospital. The court first reviewed the applicable authorities, including *People* ex rel. *Peabody* v. *Chanler,* 133 App.Div. 159 [23 N.Y.Crim. 519, 117 N.Y.S. 322] affirmed 196 N.Y. 525 [89 N.E. 1109] (upholding the New York statute), *Lynch* v. *Overholser, supra,* 369 U.S. 705 (assuming, without deciding, the validity of automatic commitment statutes), and *Ragsdale* v. *Overholser, supra,* 281 F.2d 943 (upholding a District of Columbia statute). The court in *Lally* agreed that "The reasoning of the *Peabody, Lynch* and *Ragsdale* cases (*supra*) is sound. We see no reason why a man who has himself asserted that he was insane at the time the crime was committed and has convinced the jury thereof should not in his own interest and for the protection of the public be forthwith committed for detention, examination and report as to his sanity." (P. 91.)

Next, *Lally* discussed the case of *Baxstrom* v. *Herold,* 383 U.S. 107 [15 L.Ed.2d 620, 86 S.Ct. 760], relied upon by petitioner herein. In *Baxstrom,* the court found no rational basis for the New York procedure whereunder convicted prisoners could be commited, without jury trial, to a mental institution at the end of their prison term, but all other persons sought to be civilly committed were entitled to a jury hearing prior to commitment. The court in *Lally* distinguished *Baxstrom,* however, stating that unlike the situation in *Baxstrom,* "there is a reasonable ground for giving *special treatment* to a man who has been held not guilty because insane on his own plea to that effect. The Legislatures of this and other States have felt that such a jury verdict creates a situation where public safety as well as the defendant's safety require that he be committed and examined before returning to society." (Italics added, pp. 91-92.)

Nevertheless, the New York court chose to "read into" its statutes a provision authorizing a jury trial, if requested, on the issue whether defendant may be discharged or released without danger to himself or to others, and if not, whether he is so dangerously mentally ill as to require hospitalization in Matteawan State Hospital. The court further authorized such a jury hearing in all cases before anyone can be committed to Matteawan, "[t]o

comply with the spirit if not the express language of the *Baxstrom* decision . . . ." (P. 92.) The court's holding has been interpreted as permitting automatic commitment (without jury hearing) to the custody of the Commissioner of Mental Hygiene, and thereupon to a civil state hospital, but requiring a jury hearing if the commissioner "wishes to hospitalize the patient at Matteawan." (Assn. of the Bar of the City of New York, Mental Illness, Due Process and the Criminal Defendant (1966) pp. 134-135.)

Therefore, the court in *Lally* acknowledged the constitutional validity of automatic commitment procedures, but interpreted the New York statute as authorizing a jury hearing prior to commitment at the state hospital for the criminally insane. As we have seen, our *Slayback* case has already determined that section 1026 does not contemplate such a precommitment hearing. As we shall explain, however, section 1026a does authorize a jury hearing, upon application by the person committed, after 90 days have passed from the date of initial commitment. The availability of such a hearing meets the constitutional objections which petitioner has asserted herein.

The second case upon which petitioner relies is *Bolton* v. *Harris, supra,* 395 F.2d 642, in which the court was faced with an attack upon the constitutionality of the automatic commitment statute of the District of Columbia. In *Bolton,* as in *Lally,* the court decided to read into the applicable commitment procedures a requirement that one acquitted of a criminal offense as insane be given a judicial hearing with procedures substantially similar to those in ordinary civil commitment proceedings, before he may be finally committed to a state hospital. *Bolton* reasoned that the District's automatic commitment statute was "constitutionally suspect" because it provided "radically different procedures" for patients acquitted by reason of insanity and for civilly committed persons. (P. 650.) However, that reasoning was based solely upon a peculiar characteristic of District law not present in California, namely, that an acquittal may rest only on a *reasonable doubt* of defendant's sanity.

As stated in *Bolton,* "Subsection (d) [of the D.C. statute] provides for automatic commitment without any hearing, even though acquittal by reason of insanity reflects only a reasonable doubt that the defendant was sane at the time of the offense. . . . [T]he defense may be based merely upon 'some' evidence, said to be 'more than a scintilla' but not necessarily enough to raise a reasonable doubt of sanity. The plea is neither an express nor implied admission of present illness, and acquittal rests only on a reasonable doubt of *past* sanity, *i.e.* at the time of the offense. . . . After acquittal by reason of insanity there is . . . need for a new finding of fact: The trial determined only that there was a reasonable doubt as to

defendant's sanity in the past, present commitment is predicated on a finding of present insanity. Thus *Specht* [*Specht* v. *Patterson,* 386 U.S. 605 [18 L.Ed.2d 326, 87 S.Ct. 1209)][8] would appear to require that this finding be made in a hearing." (Pp. 648-650.)

■ In California, on the other hand, the defendant had the burden of proving his insanity by a *preponderance of the evidence.* (*People* v. *Baker,* 42 Cal.2d 550, 564 [268 P.2d 705]; *People* v. *Daugherty,* 40 Cal.2d 876, 901 [256 P.2d 911].) ■ We agree with *Slayback* and other authorities which have considered the matter, that it is reasonable to presume under such circumstances that defendant's insanity, established by a preponderance of the evidence, has continued to the date of trial.[9] (E.g., *State* ex rel. *Schopf* v. *Schubert, supra,* 173 N.W.2d 673, 675-677; *State* v. *Allan, supra,* 166 N.W.2d 752, 758; *Mills* v. *State, supra,* 256 A.2d 752, 755-756; see Note, *supra,* 116 U.Pa.L.Rev. 924, 936-937; Note, 4 Harv. Civ.Rights-Civ.Lib.L.Rev. 214, 217-218.) ■ As stated in *Mills* v. *State, supra,* the fact that defendant must prove his insanity by a preponderance of the evidence constitutes "a very solid basis upon which the presumption of continuing mental illness may rest. *This difference in the fundamental nature of the verdict of acquittal by reason of insanity makes inapposite the cases in which the presumption is not recognized.* E.g. Bolton v. Harris . . . ." (P. 755.)

Moreover, it is significant that the court in *Bolton* acknowledged governmental authority "to treat persons acquitted by reason of insanity differently from civilly committed persons to the extent that there are relevant

---

[8]In *Specht,* the court struck down a Colorado statute which permitted a defendant, convicted of sex offenses punishable by a maximum of 10 years in prison, to be committed indefinitely without hearing or subsequent right of review.

[9]The presumption of continued insanity is not, of course, restricted in its application to persons acquitted of a criminal offense on the ground of insanity, for it is the general rule that when insanity has been adjudicated it is "presumed to continue unless the contrary is shown." (*In re Zanetti,* 34 Cal.2d 136, 138 [208 P.2d 657] [civil commitment]; 27 Cal.Jur.2d, Insane and Incompetent Persons, § 12, p. 335.) The force and effect of the presumption is not lessened by the fact that the defendant has been found sane enough to stand trial under Penal Code section 1368, for the test under that section is merely whether defendant is able to understand the nature and purpose of the proceedings against him and to assist counsel in conducting his defense. (*State* v. *Allan, supra,* 166 N.W.2d 752, 758-759; *Mills* v. *State, supra,* 256 A.2d 752, 756; Note, *supra,* 56 Nw.U.L.Rev. 409, 418-419; see *People* v. *Brock,* 57 Cal.2d 644, 648-649 [21 Cal.Rptr. 560, 371 P.2d 296].)

Nor is the validity of the presumption seriously impaired by the possibility that a substantial period of time could elapse between the date of the crime and the date of the trial and acquittal. In the ordinary case (as in the instant case) defendant will have been brought to trial reasonably soon after he has been apprehended. (See Pen. Code, § 1382; Crime & Delinquency in Cal.—Felony Defendants Disposed of in California Courts 1970 (Bureau of Crim. Statistics Rep. 1971) table 15, p. 19).

differences between these two groups. [Par.] We agree with Ragsdale v. Overholser [*supra,* 281 F.2d 943, 948], for example, that commitment *without a hearing* is permissible for the period required to determine present mental condition. The jury's finding of a reasonable doubt as to defendant's sanity at the time of the offense provides sufficient warrant for further examination." (Italics added; p. 651.)

As we have seen, therefore, every authority which has considered the matter, including *Lally* and *Bolton,* has acknowledged that constitutional principles do not prevent automatic or discretionary commitment without an immediate judicial hearing on the question of present sanity, so long as reasonable opportunity is provided for a prompt subsequent hearing on that question. These authorities stress that commitment is justified because defendant has, by a preponderance of the evidence, proved himself insane, thereby necessitating a further period of institutional confinement for the purpose of additional examination by medical authorities.

For example, one researcher conducted an extensive survey of psychiatrists in every state based upon his conclusion that "In the final analysis, whether a post-trial period of observation and examination is truly 'necessary' to protect the public is a factual question, to be determined on the basis of psychiatric testimony and whatever statistical evidence is available. [Par.] . . . Most of the psychiatrists who replied [to the survey] felt that a period of observation and examination would be necessary to an accurate diagnosis in at least some cases, with a substantial minority of the opinion that such a period was required in all cases, and a small minority holding the view that hospitalization was called for in only a very few cases." (Note, *supra,* 56 Nw.U.L.Rev. 443-444.) Moreover, the writer pointed out that "[M]any psychiatrists feel that the possibility of feigning recovery makes . . . a brief post-trial exam[ination] of little or no validity, and believe that a period of hospitalization is essential to an accurate diagnosis in all cases." (*Id.* at p. 445, fns. omitted; see also Scearce, *supra,* 11 Wm. & Mary U. L.Rev. 185, 197.)[10]

██ In California any person committed or transferred to a state hospi-

---

[10]It should be remembered that in California, unlike states having an automatic mandatory commitment procedure, the trial court is obligated to provide a full hearing to any defendant who appears to have regained his sanity. (Pen. Code, § 1026.) Thus, the possibility that one whose insanity was evidently temporary will be committed to a state institution for observation is greatly reduced by the California procedure. Unless restoration of sanity is apparent to the trial court, however, the foregoing authorities suggest that only through *institutional* confinement can a proper examination of the patient's mental condition be undertaken; a simple psychiatric examination performed prior to or subsequent to the verdict of acquittal would not suffice.

tal for mentally disordered persons is entitled to a prompt and thorough mental examination. (Welf. & Inst. Code, § 7251.) ▮ With respect to persons such as petitioner, the purpose underlying the 90-day interval between initial commitment and a hearing on the question of present sanity is to "permit a sufficient length of time to elapse to enable those who may be called upon to pass upon the sanity of the patient to intelligently give their judgment as to whether or not he has recovered his reason." (*In re Slayback, supra,* 209 Cal. 480, 491.) ▮ Thus, the statutory scheme contemplates that upon commitment, the hospital authorities must immediately begin to examine and observe the person committed for the purpose of determining whether he may safely be released to society. (See *In re Perkins,* 165 Cal.App.2d 73, 79 [331 P.2d 712].) Nothing in section 1026a prevents either the hospital or the patient from applying, *at any time,* for his release; to minimize the possibility of error, however, no hearing may be held on such application until the patient has been under observation for 90 days. ▮ We have concluded that institutional commitment, prior to a hearing on present sanity, is reasonable and meets constitutional requirements. We turn, then, to the question whether the 90-day "waiting period" under section 1026a is so unreasonable as to deny petitioner due process or equal protection of the laws.

As noted above, our *Slayback* case upheld the validity of a *one-year* prehearing period, under former section 1026a. The framers of the Model Penal Code determined that *six months* was "thought to be the period necessary to observe him [the patient] initially . . . ." (Model Penal Code, *supra,* § 4.08, comment (Tent. Draft No. 4) pp. 200-201.) A recorded survey of hospital superintendents asked for their own "recommended period of observation and examination necessary for accurate diagnosis"; the responses ranged from "many, many hours" to "one year," and two of the eleven doctors surveyed recommended a 90-day period. (Note, *supra,* 56 Nw.U.L.Rev. 466, Table C.) Other commentators have concurred in the view that a 90-day period of observation is appropriate in these cases. (See Hamann, *supra,* 4 Harv.J.Legis. 55, 65-66; Scearce, *supra* 11 Wm. & Mary U.L.Rev. 185, 197-198.) It is evident, therefore, that the 90-day period under section 1026a was within the range of permissible choices from which our Legislature could properly select.

It is true, as we have noted (fn. 7, *ante*), that persons sought to be confined under our civil commitment statutes need not undergo a 90-day observation period prior to a hearing on their mental condition. ▮ As we have explained, however, persons acquitted by reason of insanity are reasonably deemed to fall within a special or exceptional class, having committed a criminal offense, and having proved themselves insane by a preponderance of the evidence. Under such circumstances, a rational basis

exists for the difference in the treatment accorded such persons. (*Chase* v. *Kearns, supra,* 278 A.2d 132, 138; *State* ex. rel. *Schopf* v. *Schubert, supra,* 173 N.W.2d 673, 676-677; *Mills* v. *State, supra,* 256 A.2d 752, 756; *People* v. *Lally, supra,* 224 N.E.2d 87, 91-92; see *In re Gary W., supra,* 5 Cal.3d 296, 304.)

Under petitioner's view, a person acquitted by reason of insanity would be entitled to an immediate, precommitment, jury hearing, by the same jury which had found him insane. In addition to the fact that such a procedure would preclude the institutional examination period considered necessary by our Legislature, we note these further objections. Professor Weihofen states that "Asking the criminal trial jury to decide whether the defendant is presently sane, is illogical as well as unfair and imprudent. . . . [I]t is unfair to the public, for it empowers a jury to decide that a person charged with a serious crime was insane at the time of the act but has now recovered, and so entitled to be set free. Even a psychiatrist would hesitate to certify to recovery so soon after the insane act. A jury is quite incompetent to make this determination on the basis of evidence introduced at the criminal trial." (Weihofen, *supra,* 38 Tex.L.Rev. 849, 850.)

Moreover, such a procedure seemingly would be unfair to the defendant himself, for he would be in the position of attempting to convince the same persons who believed him once insane that he has recovered his sanity, a finding which runs counter to the "almost . . . common knowledge that insanity is for the most part a long-lasting phenomenon." (Note, *supra,* 116 U.Pa.L.Rev. 924, 935.) In the instant case, for example, petitioner committed the offense in question on February 14, 1971, and was acquitted as insane on May 6, 1971. He would likely have had difficulty convincing a jury that he had recovered his sanity in less than three months.

A further objection to any proposal which would require an immediate judicial hearing prior to commitment would be its uneconomic use of judicial machinery, for such a procedure would entail, at petitioner's option, *three* sanity hearings within the space of a few months: One to acquit him, one to commit him, and one (90 days later) to release him. We find nothing in the Constitution or the relevant statutes which would require placing such a burden upon our judicial process.[11]

---

[11]Petitioner expresses a concern that "an improper adjudication of continuing insanity at the time of his hospital commitment may conceivably haunt petitioner for years to come in his ability to vote (Elec. Code, § 383, subd. (b)), to obtain a driver's license (Veh. Code, § 12805, subd. (c)), to possess a firearm (Welf. & Inst. Code, § 8103), and to obtain professional licensing, among other practical

It is necessary, however, to analyze further the procedure available to petitioner under section 1026a to obtain a hearing regarding the restoration of his sanity, for our premise throughout this opinion has been that California's initial commitment procedures are valid only because the person committed has a reasonable opportunity to obtain his release. In particular, we must determine what the relevant standard is for deciding whether release is appropriate, whether the burden of proof properly may rest upon the person committed to establish his right to release, and whether he may demand a jury trial to decide the matter.

Both petitioner and the People join in the proposition that the relevant standard under section 1026a is not whether the person committed is no longer legally insane, but whether he has improved to the extent that he is no longer a danger to the health and safety of others, including himself. (*In re Jones,* 260 Cal.App.2d 906, 911-912 [68 Cal.Rptr. 32]; see *In re Slayback, supra,* 209 Cal. 480, 490 ["no longer a menace to the public nor dangerous to themselves"]; *People* v. *Mallory,* 254 Cal.App.2d 151, 155-156 [61 Cal.Rptr. 825] [rejecting M'Naughton test as appropriate for determining restoration of sanity]; Welf. & Inst. Code, § 7375, subd. (b.) [standard for parole of persons committed under Pen. Code, § 1026]; Berg, *Release of Criminal Defendants Acquitted Because of Insanity,* 46 L.A. Bar Bull. 21, 40-41; Model Penal Code, *supra,* § 4.08, comment [Tent. Draft No. 4], pp. 199-200; Hamann, *supra,* 4 Harv.J.Legis. 55, 81-88.) We adopt the foregoing standard as applicable to proceedings under section 1026a.

Section 1026a specifies that "In any hearing authorized by this section the burden of proving that his sanity has been restored shall be upon the applicant." Again, there seems to be no serious dispute among the authorities regarding the propriety of requiring one who has proved himself insane at the time of the offense to prove that he has recovered his sanity. (See *Chase* v. *Kearns, supra,* 278 A.2d 132, 137-138 [requiring proof beyond a reasonable doubt]; *State* v. *Allan, supra,* 166 N.W.2d 752, 758 [same]; *Ragsdale* v. *Overholser, supra,* 281 F.2d 943, 947 [same]; *Newton* v. *Brooks, supra,* 426 P.2d 446, 450 [proof by preponderance of the evidence]; *Mills* v. *State, supra,* 256 A.2d 752, 758 [same]; *Bolton* v. *Harris, supra,* 395 F.2d 642, 653 [same]; *State* v. *Blubaugh* (1971) 80 Wn.2d 28

handicaps." The cited provisions create disabilities for persons who have been adjudicated to be insane or a danger to others; quite clearly these disabilities cease once a contrary adjudication is made. Thus, in the case of one who has been acquitted of a criminal offense on the ground of insanity, any civil disability arising thereby could disappear 90 days thereafter, and in no event would extend beyond the date upon which the court determines that he has regained his sanity.

[491 P.2d 646] [proof that release consistent with public safety is "highly probable"]; Annot., 95 A.L.R.2d 54, 106-108, and cases cited.)

Petitioner points out, however, that the imposition of the burden of proof upon the patient under section 1026a differs from the practice in ordinary civil commitment proceedings. For example, to detain (beyond an initial 72-hour treatment and evaluation period and an additional 14-day intensive treatment period) those persons alleged to have threatened, attempted or actually inflicted physical harm to others, the court or jury must first find that such threat, attempt or harm actually occurred, and that the person "as a result of mental disorder, presents an imminent threat of substantial physical harm to others." (Welf. & Inst. Code, § 5304.) To commit a present or potential narcotics addict, the court or jury must first find that the person is addicted to narcotics or is, by reason of repeated narcotics use, in imminent danger of addiction. (Welf. & Inst. Code, §§ 3050, 3051, 3106, 3108.) To commit a person alleged to be a mentally disordered sex offender, the court or jury must, of course, find that he is such an offender and that he could benefit by treatment in a state hospital. (Welf. & Inst. Code, §§ 6316, 6318, 6321.) To commit a mentally retarded person to a state hospital, the court must find that the person is mentally retarded and a danger to himself or others. (Welf. & Inst. Code, §§ 6500.1., 6509.)

Presumably, the burden would be upon the person or agency applying for the initial commitment of the foregoing persons to establish to the satisfaction of the court or jury that the facts which would justify commitment truly exist. In none of these categories, however, has there been a prior judicial determination of insanity. As we have seen, by reason of that determination, persons acquitted by reason of insanity fall within a special class, thereby providing a rational basis for differences in the treatment afforded them. (E.g., *Chase* v. *Kearns, supra,* 278 A.2d 132, 138; *Mills* v. *State, supra,* 256 A.2d 752, 758.) *Chase* and *Mills* both expressly hold that equal protection principles do not forbid differences in the allocation of the burden of proof imposed upon persons acquitted by reason of insanity and other persons seeking release from involuntary civil commitment. ▮ As stated by the Delaware Supreme Court in *Mills,* "The burden of proving that he is no longer subject to the mental abnormality which produced his criminal act is a fair and reasonable distinction, although a civilly committed patient would have no such burden . . . , in view of the fact that the [former] patient had successfully proved his own mental illness to the satisfaction of a jury." (P. 758.)[12]

---

[12]In *Bolton* v. *Harris, supra,* 395 F.2d 642, the court found itself constitutionally compelled to read into the District of Columbia statute a requirement that a hearing

 Therefore, we agree with the Supreme Court of Maine, in *Chase,* that "The special interest which the public has acquired in the confinement and release of people in this exceptional class results from the fact that there has been a judicial determination that they have already endangered the public safety and their own as a result of their mental conditions as distinguished from people civilly committed because of only potential danger." (278 A.2d at p. 138.)

As indicated above, several authorities would impose upon the person committed the burden of proving his readiness for release *beyond a reasonable doubt.* As stated in *Chase,* " 'reasonable medical doubts and reasonable judicial doubts [must] be resolved in favor of the public.' The evidence presented must satisfy [the court] beyond a reasonable doubt that there is no likelihood of his causing injury to himself or others." (278 A.2d at pp. 137-138.) After careful consideration of the matter, however, we conclude that neither the language of section 1026a nor sound policy considerations dictates such a strict standard of proof. In *Newton* v. *Brooks, supra,* 426 P.2d 446, 450, the court was faced with a similar choice and resolved the matter as follows: "As far as the standard of proof is concerned, some cases hold, in effect that the patient must show beyond a reasonable doubt that he has recovered his 'sanity.' We do not believe so strict a standard is required by our [Oregon] statute. If the patient can show by a preponderance of the evidence that his release will probably not be a danger to the public, the statutory purpose will be reasonably served. Therefore, we adopt the preponderance-of-evidence rule."

be held following an initial examination period, but prior to "final" commitment. At such hearing, commitment will result only if the court finds, by a preponderance of the evidence, that the person is "likely to injure himself or other persons" due to his mental illness. (P. 651, fn. 50.) Thereafter, to obtain his release from commitment, the burden is placed upon the patient to show, by a preponderance of the evidence, that he is no longer likely to injure himself or others due to his mental condition. (P. 653.)

It is clear that the court in *Bolton* imposed the initial burden of proof upon the state because the defendant's acquittal is based only upon a mere doubt as to his sanity. (See 395 F.2d at pp. 648-650.) As stated by a commentator, "Generally, the risk of non-persuasion is on the person seeking release. In those jurisdictions [such as California] where the jury determined that the defendant was insane at the time of the crime by a preponderance of the evidence, the presumption of continuing insanity might be used as an evidentiary presumption which requires the former defendant to introduce some evidence of recovery in order to shift the 'burden of going forward' to the state. But in those jurisdictions [such as District of Columbia] where the jury was required to acquit if there was reasonable doubt of sanity, some positive adjudication of insanity should be required for continued commitment, and the state should logically be required to bear the burden of proof."

(Fns. omitted: Note, *supra,* 56 Nw.U.L.Rev. 409, 452; see Note, *supra,* 116 U.Pa.L.Rev. 924, 940.)

The commentators have uniformly rejected the beyond-reasonable-doubt test in favor of the preponderance-of-evidence test. (See Hamann, *supra,* 4 Harv.J.Legis. 55, 88; Note, *supra,* 4 Harv.Civ.Rights-Civ.Lib.L.Rev. 214, 219-221; Note, *supra,* 56 Nw.U.L.Rev. 409, 452.) Moreover, we note that under Evidence Code section 115, "Except as otherwise provided by law, the burden of proof requires proof by a preponderance of the evidence." ■ Since section 1026a does not specify a greater burden, we conclude that petitioner and other persons committed under section 1026 may obtain their release by establishing, by a preponderance of the evidence, that they are no longer a danger to the health and safety of themselves or others.

We also believe that persons such as petitioner should have the opportunity of a jury hearing, if requested, to determine whether they should be released to society under Penal Code section 1026a. Although petitioner's status as a member of a special or exceptional class justifies certain differences in commitment procedure, including mandatory or discretionary prehearing commitment for a minimum of 90 days and imposition upon him of the burden of proving his fitness for release, we find no sufficient reason why his status necessarily must deny him the jury hearing available to other persons committed to state hospitals. For example, a mentally disordered person proposed for postcertification treatment because he presents an imminent threat of substantial physical harm to others is entitled to be represented by counsel and to demand a jury trial. (Welf. & Inst. Code, § 5302.) Gravely disabled persons who have been detained for the 72-hour evaluation and the 14-day certification treatment and for whom a conservatorship is proposed are entitled to a jury trial on the issue whether they are truly gravely disabled. (Welf. & Inst. Code, § 5350, subd. (d); see *In re Gonzales,* 6 Cal.3d 346, 349 [99 Cal.Rptr. 17, 491 P.2d 809].) We recently held that equal protection principles demand that a jury trial likewise be made available to Youth Authority wards before their term of confinement for treatment may be extended for a period beyond the date on which their release otherwise would be mandatory. (*In re Gary W., supra,* 5 Cal.3d 296; see Welf. & Inst. Code, §§ 1800-1803.)

The court in *Mills* v. *State, supra,* 256 A.2d 752, 757, upheld the validity of the Delaware discretionary commitment statute, but read into that statute a right to a jury trial at the subsequent release hearing, reasoning that "The essential safeguard provided . . . to a patient civilly committed is jury trial of the issue of present mental illness. We think that equal protection of the laws requires that a . . . patient [previously committed following acquittal by reason of insanity] have a similar right.

[Citations.] Because we find no rational justification for withholding . . . the safeguard of jury trial of the issue of present mental illness, we construe [the applicable statute] to require jury trial of that issue."

 Although there are certain authorities which question the advisability of a jury determination of an essentially medical question such as restoration of sanity (see Hamann, *supra*, 4 Harv.J.Legis. 55, 70-71; Note, *supra*, 116 U.Pa.L.Rev. 924, 940-941), we are convinced by the reasoning of the *Mills* case, *supra*, that petitioner is constitutionally entitled to a jury trial on the question of his release, should he request it. It is noteworthy that section 1026a does not, by its terms, preclude a jury trial, and at least one court has assumed that "at the [section 1026a] hearing which follows the [90-day] minimum period of confinement the defendant would . . . be afforded his full constitutional rights." (*In re Jones, supra*, 260 Cal.App.2d 906, 911, fn. 3 [right to appointed counsel at a § 1026a hearing].)

In *In re Gary W., supra*, 5 Cal.3d 296, 308, we held that the appellant was entitled to a jury trial *and three-fourths verdict*, since the commitment of Youth Authority wards under section 1800 of the Welfare and Institutions Code was "most closely analogous" to the civil commitment procedures for mentally disordered sex offenders and narcotics addicts, each of which classes are entitled to such procedure. We conclude that principles of equal protection and fairness require that persons in petitioner's class be given the advantage of such a three-fourths verdict, so that they may obtain their release to society upon establishing to the satisfaction of at least three-fourths of the jurors that they no longer constitute a danger to the health or safety of themselves and other persons.

On the basis of the foregoing discussion we conclude that petitioner's original commitment to Atascadero was valid. The order to show cause, having served its purpose, is discharged, and the writ of habeas corpus denied.

Wright, C. J., McComb, J., Peters, J., Tobriner, J., Mosk, J., and Sullivan, J., concurred.