[Crim. No. 35715. Second Dist., Div. One. June 2, 1980.]

THE PEOPLE, Plaintiff and Respondent, v.
ESTELLA SALAS, Defendant and Appellant.

---

COUNSEL

Ira Johns, under appointment by the Court of Appeal, for Defendant and Appellant.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, S. Clark Moore, Assistant Attorney General, Edward T. Fogel, Jr., and Susan D. Martynec, Deputy Attorneys General, for Plaintiff and Respondent.

---

OPINION

RIMERMAN, J.*—This is an appeal taken from the order committing appellant to the state hospital.

## INTRODUCTION

In an information filed by the District Attorney of Ventura County, appellant was charged in count I with assault with intent to commit murder, a violation of Penal Code section 217. In count II, it was alleged that appellant had violated section 273a, subdivision (1) of the Penal Code, in that she caused or permitted a child to suffer, or inflicted thereon, unjustifiable physical pain or mental suffering. In count III, it was alleged that appellant willfully inflicted on a child cruel or inhuman corporal punishment. Appellant pleaded not guilty and not guilty by reason of insanity.

Appellant personally withdrew her plea of not guilty as to count III and entered a plea of nolo contendere to willfully inflicting cruel or inhuman corporal punishment on a child, a felony. As to the issue of not

*Assigned by the Chairperson of the Judicial Council.

guilty by reason of insanity, appellant waived her right to a jury trial and the waiver was accepted by the court.

The court found appellant not guilty by reason of insanity. The court further found that appellant had not recovered her sanity and appellant was referred to the Ventura County Department of Mental Health for evaluation and report.

Subsequently, the court found that appellant would benefit from an out-patient program. The court ordered that appellant be confined to the state hospital, Camarillo, California, for the minimum period of 90 days pursuant to section 1026 of the Penal Code prior to participating in an out-patient program.

FACTS

Dr. Rex Beaber, a clinical psychologist testified for the defendant. He conducted a forensic examination of the defendant, Estella Salas. He reviewed many medical records and hospital records concerning the defendant, and a letter written by the defendant's sister, which Dr. Beaber used as a history of the defendant. The doctor concluded that the defendant had a capacity to appreciate the criminality of her conduct, but did not have the capacity to conform her conduct to the requirements of the law. He further concluded that she suffers from schizophrenia. This is supported by the clinical data that she suffers from consistent delusions, usually focused on her children. She had auditory and visual hallucinations, which ordered her to do things such as to strip off her clothes and run away nude, or to do something destructive to her children. The doctor indicated that she wanted to be helped and would seek help from therapists and sought to take more medicine to control her impulses. He testified that during the act of choking her younger child, she finally reached a brief moment when she realized what she was doing and how bizarre and unacceptable it was to her own values that she stopped the act. She phoned the police and she requested to be incarcerated.

The doctor said that Mrs. Salas suffers from the common delusion that one of her children is a saint and one is the Devil. The defendant also heard voices telling her to take her own life. The doctor testified that the defendant's three-year-old child, Gilbert, turned blue during the time that he was being choked by the defendant.

The doctor said that the defendant should continue in the type of treatment that she had been getting on an out-patient basis, and she should have no responsibility for caring for minors. He did not feel that she should be institutionalized in Atascadero or Camarillo State Hospital. This would be upsetting to the defendant and it might promote some regression.

Dr. Donald Patterson, a psychiatrist testified that he talked to the defendant and reviewed her past medical records. He diagnosed the defendant as a paranoid of some type with a mental disorder of schizophrenia. She was unable to appreciate the wrongfulness of her acts and conform her behavior to the requirements of law. He indicated that the defendant needed treatment in a mental setting. There are such placements outside of the state hospital.

Dr. Thomas Von Dedenroth, a forensic psychiatrist, examined the defendant and reviewed her records before said examination. His opinion was that she suffered from a mental defect. She could not appreciate her conduct or conform her conduct to the requirements of the law. He diagnosed her as being a schizophrenic of the paranoid type. She must be kept on antipsychotic medication.

Dr. Ronald Thurston, a psychiatrist, examined the defendant on two occasions. He also reviewed other medical records concerning the defendant. He diagnosed her as having chronic schizophrenia with a debilitating effect; she was psychotic and had delusions.

Mrs. Lynda Thayer testified in behalf of the People. She was a police service officer for the City of Oxnard assigned to communications. She received and handled emergency telephone calls. On Saturday, December 30, 1978, she was working when an emergency call at 11:08 a.m. was received in which the caller stated she had killed her son. The call was first taken by Doris Lynden but then Mrs. Thayer took over. The call card was time stamped as soon as the call came in. The police were notified at 11:09. Mrs. Thayer saw the defendant at the police station at 11:35, when she skin searched her. The defendant understood and followed instructions. The defendant asked Mrs. Thayer about her child and what the charges were against her. The defendant exhibited fingernail scratches on her right rear forearm.

The defendant made no mention to Mrs. Thayer of voices she heard or being compelled to do anything.

Kauzo Sakomoto, a police officer for the City of Oxnard, testified for the People. He responded to the police radio call and went to Mrs. Salas' home. He got there in about two minutes. Officer Castruita and Lt. Latimer arrived there at the same time. Lt. Latimer approached the house and told the people to step out the front door. He said it again, in Spanish, and the defendant stepped out with a child in her arms.

Officer Sakomoto transported the defendant to the hospital where she signed documents for the treatment of her son, Gilbert, the victim. He then took her to the police station. He was with the defendant from one and a half to two hours that morning after the act by defendant on her son. Defendant appeared to understand everything and responded to what was requested of her. She made no statement as to hearing voices or being compelled to do anything.

Donald A. Boger, a detective for the Oxnard Police Department testified that he was the investigating officer and he questioned the defendant. He said she seemed a little bit afraid and complained of headaches.

At the trial the court considered certain tape recordings and transcriptions thereof, of the call made by the defendant to the police department, and the taped interview of defendant by Detective Boger.

The court found the defendant not guilty by reason of insanity. The court concluded that the defendant was chronically mentally ill with a major psychosis. That she was unable to conform her conduct to the requirements of the law. She should not ever have the responsibility for the care of any children or any child. The court found that defendant had not regained her sanity and referred the case to the mental health department for a report. Pursuant to section 1026 of the Penal Code, the court ordered the defendant confined to a state hospital, Camarillo State Hospital, for a minimum of 90 days before being released to an out-patient program.

Issues

On appeal defendant contends that section 1026 of the Penal Code, making mandatory a 90-day commitment to a state hospital, is violative of the constitutional prohibition against cruel and/or unusual punishment and is a denial of her right to equal protection of the laws.

DISCUSSION

Appellant's contentions are not meritorious as being violative of her constitutional rights. Penal Code section 1026 in pertinent part provides: "(b) If the defendant has been found guilty of...an act which poses a serious threat of bodily harm to another person, the court shall direct that the defendant be confined in a state hospital or other public or private mental health facility approved by the county mental health director for a minimum of 90 days before such defendant may be released on outpatient treatment pursuant to Section 1026.1 or subdivision (f) of Section 7375 of the Welfare and Institutions Code."

Appellant attempts to support her contention that her mandatory confinement in a state hospital as a precondition to out-patient treatment constitutes cruel and/or unusual punishment by focusing on the evaluation reports submitted to the trial court following its verdict that appellant was not guilty by reason of insanity. Appellant emphasizes that the conclusions reached in these reports by Dr. Beaber, Dr. Keating, Dr. Patterson and Mary Lopez were: that appellant was then passive and no longer assaultive; that institutionalization was unnecessary and counterproductive; that the original crime was one specifically situationally related; that care and treatment for appellant was available outside of the state hospitals; that if released on her own recognizance, appellant would not jeopardize public safety; and finally that it was possible that commitment would cause some harm to appellant. Thus, appellant argues that since there was no medical consensus that commitment in a state hospital would be beneficial to her, and perhaps might be harmful, such commitment would, in effect, be cruel and/or unusual punishment.

It must be understood that a commitment to a hospital for a 90-day period of observation and diagnosis is not punishment. (*In re Jones* (1968) 260 Cal.App.2d 906, 913 [68 Cal.Rptr. 32]; *Rouse v. Cameron* (D.C. Cir. 1966) 373 F.2d 451, 452-453; *In re Ingram* (1978) 76 Cal.App.3d 495 [142 Cal.Rptr. 825].) The defendant here pleaded nolo contendere to a felony and was found not guilty by reason of insanity. She was not sentenced to state prison, but after a finding that she had not yet regained her sanity she was ordered to be committed to a state mental hospital for 90 days.

This is unlike and distinguishable from the cases cited by appellant, to wit, *In re Lynch* (1972) 8 Cal.3d 410 [105 Cal.Rptr. 217, 503 P.2d

921], and *People* v. *Wingo* (1975) 14 Cal.3d 169 [121 Cal.Rptr. 97, 534 P.2d 1001], where defendants were convicted of felonies and sentenced to prison.

In the *Lynch* case, *supra*, the defendant was convicted, a second time, of indecent exposure. The sentence called for punishment by imprisonment for not less than one year. The court ruled that the sentence was disproportionate to the crime and therefore cruel and inhuman punishment.

In the *Wingo* case, *supra*, the defendant was convicted of a violation of Penal Code section 245, subdivision (a), which authorized imprisonment for six months to life. There, the court considered the aspects of the amount of time sentenced as it bears to the offense for which convicted. The court did not determine whether the sentence was disproportionate because the Adult Authority had not yet fixed a term for the defendant.

Although we are here dealing within the framework of the Penal Code of California, we are not dealing with punishment at this point. There does not appear to be anything punitive about section 1026, subdivision (b) of the Penal Code. Further, in said subdivision (b) we are told that the purpose of the 90-day commitment is so that the defendant may be placed in an out-patient program. Defendant would have us construe defendant's commitment to the 90-day observation in the same light as a commitment to state prison. █ If she were committed to a state hospital for treatment and no treatment was given, this may be construed as cruel and unusual punishment. (*People* v. *Feagley* (1975) 14 Cal.3d 338, 359 [121 Cal.Rptr. 509, 535 P.2d 373].) █ However, defendant here is not confined for punishment, nor for treatment, but for observation by trained experts to determine her future course of care.

In *Estate of Gestner* (1949) 90 Cal.App.2d 680 [204 P.2d 77], the defendant was charged with having committed a burglary. He was found to have been insane at the time of the commission of the offense. He was committed to a state hospital for the criminally insane. In a suit to collect money from the insane person's estate, to pay for his room and board, the court on appeal had before it section 1026 of the Penal Code and said that the commitment under the section is not penal in character. Further, in *In re Slayback* (1930) 209 Cal. 480, 491 [288

P. 769], the court says "The restraint and detention imposed is not, as we have seen, for the purpose of inflicting punishment upon a defendant. . . ." ▊ As stated in *In re Franklin* (1972) 7 Cal.3d 126 [101 Cal.Rptr. 553, 496 P.2d 465], the 90-day commitment affords a reasonably necessary time to provide for a defendant to be observed and examined. Also, the standards set forth in the statute fulfill the requirements of due process and equal protection of the laws.

The 90-day commitment, which may be viewed as a period of custodial observation can hardly be viewed as cruel or unusual punishment. At a time in the past evolution of legal history, insane persons and minors were treated on a par for certain circumstances. In *People* v. *Getty* (1975) 50 Cal.App.3d 101 [123 Cal.Rptr. 704], the court had before it for consideration, a person committed to the Youth Authority for a period of six months. The court says that a commitment under the Youth Authority Act for up to age 25 or until not necessary for protection of the public does not constitute cruel or unusual punishment. Defendant's primary and perhaps only objection to this procedure seems to be that she will be away from the program that she had already been in on an out-patient basis, at the time she committed the offense before us. She relies on opinions by the doctors who testified at trial, that confinement for 90 days would be harmful to her progress. We must not forget that defendant had been in a long term out-patient program at the time she committed the act against her child.

Confinement to a hospital for the purpose of observation, diagnosis, and planning a future program toward rehabilitation is vastly different than a sentence to state prison, which has now been said to be for the purpose of punishment. (Pen. Code, § 1170, subd. (a)(1).) Defendant upon being confined to the state mental hospital is to be examined with a view to her sanity; rehabilitative measures and programs are to be instituted. That is the primary objective. There is no thought of punishment. The return to mental health is the objective.

▊ It is evident that we are not here dealing with "cruel and/or unusual punishment" since appellant was not convicted of a crime and is not being punished as a result of that conviction.

▊ Appellant further contends that she is not afforded equal protection of the laws because the statute creates an arbitrary and unreasonable classification prejudicial to persons found not guilty of

violent offenses by reason of insanity while persons found not guilty of nonviolent acts by reason of insanity are not subject to the mandatory confinement.

In *In re Franklin* (1972) 7 Cal.3d 126 [101 Cal.Rptr. 553, 496 P.2d 465], the court reasons that the person acquitted of the criminal offense, has proved himself insane by a preponderance of the evidence and has created a circumstance for being treated in a way the law deems necessary to treat such persons. The court in the case of *People v. Hurt* (1979) 90 Cal.App.3d 974 [153 Cal.Rptr. 755], rehearing denied by the Supreme Court, had the same problem before it as we do here. The court there, as we do here, concluded that the statute was mandatory; there was no discretion in the trial court. The discretion is in those cases of nonviolent crimes. Where different provisions are set up for different procedures, it is not to be taken as a denial of equal protection of the laws. The state has a legitimate interest to protect, to wit, the safety of the public at large. To that end, the state may enact legislation designed to require that persons found not guilty of violent offenses by reason of their insanity be committed to a mental institution for a period of 90 days. This rule applies to all persons similarly situated. It cannot be said that it applies to this appellant, or any defendant in a like situation exclusively, and not to others in the same situation. It may be true, that this appellant has been allowed to remain released on her special own recognizance to remain at the household of Pearl Aguilar, during the pendency of this action, but this is not the type of out-patient treatment contemplated by the statute. This was a form of bail, to ensure appellant's attendance in court without having to be in custody. Once the adjudication was made, the law became mandatory.

The thrust of defendant's argument appears to be that all persons adjudged insane must be treated alike, whether such adjudication arises out of a criminal act or whether the person has been so adjudged in a civil proceeding, where no criminal act has been committed, or where a criminal act has been committed but of a nonviolent nature.

The case of *Cotton* v. *Municipal Court* (1976) 59 Cal.App.3d 601 [130 Cal.Rptr. 876], cited by defendant, to the effect that there must be a compelling state interest to justify the law, and there must be a rational basis for distinction where persons are treated differently under the law, *In re Gary W.* (1971) 5 Cal.3d 296 [96 Cal.Rptr. 1, 486 P.2d 1201], is apt here.

It is submitted that a rational basis for distinction exists in that section 1026 of the Penal Code tells us that we must look to the criminal act involved as to whether there was a threat of serious bodily injury or there was violence resulting in death or injury.

The state has a compelling interest to protect its citizens from any such further acts by defendant or the threat of such further acts.

It is a perfectly legitimate function of the state to provide different procedures for different classifications of individuals, who come within the purview of certain prescribed standards of conduct, which would not constitute a denial of equal protection of the laws.

### DISPOSITION

The order committing the appellant to the state mental hospital for a period of 90 days' observation is affirmed.

Jefferson (Bernard), P. J., and Hanson (Thaxton), J., concurred.

A petition for a rehearing was denied June 27, 1980.