[Civ. No. 12193. Fourth Dist., Div. Two. Oct. 11, 1973.]

Estate of BALDWIN M. BALDWIN, Deceased.
MARUJA BALDWIN, as Co-executrix, etc., et al.,
Petitioners and Appellants, v.
SEELEY COMPANY et al., Claimants and Appellants;
SKYLINE REALTY, INC., et al., Claimants and Respondents.

**COUNSEL**

Meserve, Mumper & Hughes, J. Robert Meserve, Allan Jacobs and Ray L. Herndon for Petitioners and Appellants.

J. Gregg Evans for Claimants and Appellants.

Plath & Thurber and Marshall Thurber for Claimants and Respondents.

**OPINION**

**KERRIGAN, J.**—Frank E. Lembi ("respondent") is a licensed real estate broker. He conducts his business under his own name and the fictitious names of Skyline Realty and Skyline Realty, Inc. While Lembi is licensed, Skyline Realty is not.

The principal question involved in this appeal is whether the trial court acted with propriety in awarding Lembi a $76,500 commission for his services in connection with a probate sale.

During the course of the administration of the estate of Baldwin M. Baldwin, deceased, it became necessary to sell a vast apartment complex owned by the estate known as "Baldwin Hills Village" or "The Village Green" (herein "Village"),[1] in order to obtain sufficient funds to pay federal estate taxes, state inheritance taxes and expenses of administration.

Inasmuch as the first installment on the federal estate tax was due and payable on December 18, 1971, the co-executrices, Maruja Baldwin and Thelma L. Krieger ("cross-appellants"), acting through their counsel, apparently notified several prospective purchasers that a private sale of the Village would be conducted in their attorney's office on November 15, 1971. Lembi had evidently indicated an interest in the property over a period of several months. In any event, he was present at the private sale and at the time thereof, the co-executrices sold the Village to him for $6,000,000 cash, subject to court confirmation of the sale.

A return of sale of real and personal property as a unit and petition for order confirming sale (herein "petition for confirmation") was prepared by the co-executrices' attorney in which it was requested that the sale be approved and that Skyline Realty, Inc. be allowed a commission of $153,000 if the sale was consummated.

The hearing on the petition for confirmation came on before the court on December 9, 1971. All parties interested in the estate and in purchasing the property were either present or represented by counsel including the co-executrices, Lembi, representatives of the brokerage firms, The Seeley Company and J. R. McGonagle, Inc. ("appellants"), and the latter's clients, Donald H. Albrecht and William S. Lund. When the matter was called, the co-executrices' attorney (Meserve) stated that the estate was only interested in a cash bid and the transfer of the entire real and personal property as a unit. He then informed the court that "it recently has come to the attention of the Executors that there could be some question as to the propriety of the award of a commission in regard to the original bid; namely, the bid of Mr. Frank E. Lembi. . . . Mr. Lembi's bid is signed as a bidder, Frank E. Lembi. There is an additional page which Your Honor observed there which is described as Acceptance by Broker. It is signed 'Skyline Realty,

---

[1]The Village is composed of 629 dwelling units and the appurtenant buildings and personal property (furniture, furnishings, appliances and equipment) necessary to the operation of such a huge project.

Inc.' Mr. Lembi or someone filled in 'license number E-58107 [Lembi's individual license number], by Frank E. Lembi.' [¶] On information, the Corporations Commissioner indicates that there is a California corporation by the name of Skyline Realty, Inc. However, a check with the Real Estate Commissioner indicates there is no license issued to Skyline Realty, Inc., or any name similar to that. The only license we were able to find and the license which corresponds to the number E-58107 [on the Broker's Acceptance] is issued to Frank E. Lembi, doing business as Skyline Realty. So, Your Honor, it appears to us that the bidder and the broker on the original bid are one and the same party." However, Attorney Meserve urged the court to proceed with the sale.

The court indicated it would conduct the sale inasmuch as the parties were desirous of having a sale effected and would take the matter of the brokers' commission under submission.

Thereafter, spirited bidding took place between Lembi on the one hand and Albrecht and Lund on the other. During the course thereof, Lembi, Albrecht and Lund inquired as to what the court's ruling would be on the commission issue and the court indicated it would conduct the sale and later decide the commission.

On the final bid the property was sold to Albrecht and Lund for $6,-750,000. Their brokers, Seeley-McGonagle, requested a commission of $200,000.

After confirming the sale to Albrecht-Lund in the sum of $6,750,000, a formal order confirming sale was prepared. This order authorized a conveyance of the Village property to Albrecht-Lund and was signed on December 16, 1971. However, the brokerage amount was left blank in the order inasmuch as the estate's attorney and the buyers were interested in consummating the sale and closing escrow the following day.

On December 24, 1971, the court filled in the blank space provided in the order confirming sale by inserting therein the figure "$171,750.00." The same day it made a minute order which contained its findings and conclusions as to the total amount of real estate commission which should be allowed in connection with the Village sale and dividing or allocating that commission as follows: The total commission was naturally fixed at $171,750; $76,500 was allocated to Lembi (individually); and $95,250 to Seeley-McGonagle. A formal order for payment of real estate commission was filed on January 21, 1972.

The court's findings with respect to the total commission and the allocation of commission are ideally framed and are therefore set forth in their entirety:

"This matter was taken under submission on December 9, 1971, to determine the amount of commission to be paid. The Court finds that the original Return of Sale contained a provision that the Co-Executrices entered into a sale and agreed to a commission of $153,000.00 on a $6,000,000.00 sale.

"The Court further finds that the original Return of Sale and the representation of the Attorney for the Co-Executrices was that the Co-Executrices felt that $153,000.00 was a reasonable commission in view of the size of the sale. The Court finds that the commission agreed to be paid pursuant to the Return of Sale originally filed with the Court was computed at 6 per cent on the first $50,000.00; 5 per cent on the next $50,000.00; and 2½ per cent on the balance, making a total of $153,000.00 on a $6,000,000.00 sale, which commission was alleged to be satisfactory to the Co-Executrices and was the best bid and on the best terms available.

"The Court does further find that Frank E. Lembi is a duly licensed broker, and that it was through the efforts and by agreement with Mr. Lembi that the original Return of Sale was filed and brought before the Court for confirmation as the best bid and on the best terms available.

"The Court does further find that there was a full disclosure to the Co-Executrices by Frank E. Lembi regarding Mr. Lembi's position as broker and purchaser. The Court further finds that because of the efforts of Frank Lembi, the original sale was brought into court and bidding was commenced on the original Return of Sale, and that Frank E. Lembi is entitled to the same commission for his efforts as would be available to any originating broker.

"The Court proceeded and allowed the sale to go forward on the basis that Mr. Lembi was the originating broker.

"The Court determines that the formula as agreed upon originally by the Co-Executrices is a reasonable and fair method of compensation. Pursuant to said formula, the Court now fixes the total commission to be allowed on the sale at $171,750.00, of which the Court allocates one half of $153,000.00 (which is the amount of the original commission) to Frank E. Lembi, or the sum of $76,500.00.

"The Court further finds and hereby fixes as reasonable for services rendered, a commission in the amount of $95,250.00 to THE SEELEY COMPANY and JOHN R. McGONAGLE, INC., (agents for successful bidder). Said commission is based upon one half of the original commission, which was $153,000.00, or the amount of $76,500.00 plus 2½ per cent of the overbid of $750,000.00, which is $18,750.00."

The co-executrices and Seeley-McGonagle moved for a new trial on the commission issue. Their motions were denied.

Seeley-McGonagle appeal from that portion of the order confirming sale which fixed the total commission at $171,750 and from the order for payment of real estate commission. The co-executrices also cross-appeal from the two orders insofar as they accorded Lembi a commission. Multiple issues are raised in both the appeal and cross-appeal. However, Seeley-McGonagle's main complaint is that Lembi should not have been allowed any commission and that it should have been granted the entire $171,750. On the other hand, the estate claims that Seeley and McGonagle were paid a reasonable commission and that Lembi should not have been granted any commission. A corollary issue raised by both appellants and cross-appellants is that they were denied the opportunity to present evidence on the commission issue (due process of law). Naturally, Lembi claims that he was entitled to the commission allowed. Quite remarkably, he is joined in response to the appeals by two of the principal residuary beneficiaries of the estate, to wit, Brian M. Baldwin and Bruce M. Baldwin (Respondents) who obviously feel that Lembi is entitled to the commission allowed him.

## LEMBI COMMISSION

Both appellants and cross-appellants complain that Lembi never had a written contract with the estate, as required by California probate law and the statute of frauds, and, therefore, is not entitled to a commission.

Section 760 of the Probate Code provides: "The executor . . . may enter into a *written* contract with any bona fide agent or broker . . . to secure a purchaser for any real or personal property of the estate, which contract may provide for the payment of a commission out of the proceeds of the sale." (Italics added.) Under section 1624, subdivision 5, of the Civil Code, an agreement authorizing or employing a broker to purchase or sell real estate for compensation or a commission is invalid unless such agreement, or some note or memorandum thereof, is in writing and subscribed by the party to be charged or by his agent.

Here, there was a written bid and acceptance dated November 15, 1971. The bid was signed by Lembi; the acceptance was executed by the co-executrices. The executed bid and acceptance were filed with the court, together with the return and petition. These instruments provided that the estate would pay Skyline Realty, Inc. a sales commission of $153,000 in the event the private sale was confirmed. Annexed to the bid and acceptance was a document entitled, "Acceptance by Broker" which provided that "Skyline Realty, Inc., by Frank E. Lembi," accepted the sum of $153,000 as a commission. In addition, Lembi made a substantial down payment on the property after the private sale ($200,000) and an escrow was opened providing for the conveyance to Lembi and the payment of a broker's commission. Patently, these documents were sufficient to satisfy the statutory requirements of a written contract to pay a broker's commission and the trial court expressly found there was an agreement to pay a commission.

■ It is next maintained that the written contract employing Skyline Realty, Inc. to act as a broker is illegal, void and unenforceable because Skyline was unlicensed and if Skyline cannot recover, Lembi likewise cannot prevail.

Section 10136 of the Business and Professions Code relating to the licensing of real estate brokers provides as follows: "No person engaged in the business or acting in the capacity of a real estate broker . . . within this State shall bring or maintain any action in the courts of this State for the collection of compensation [for negotiating a sale] without alleging and proving that he was a duly licensed real estate broker . . . at the time the alleged cause of action arose." A corporation is a "person" within the meaning of the foregoing statute (*Smithson* v. *Sparber,* 123 Cal.App. 225, 230 [11 P.2d 90]). The broker's licensing law applies in probate proceedings and an unlicensed broker employed by an estate cannot recover (*Estate of Prieto,* 243 Cal.App.2d 79, 85 [52 Cal.Rptr. 80]) as the agreement is illegal, void and unenforceable. (*Haas* v. *Greenwald,* 196 Cal. 236 [237 P. 38, 59 A.L.R. 1493]; *Estate of Prieto, supra,* 243 Cal.App.2d 79, 85.)

Obviously, Skyline Realty, Inc. could not recover a commission. It was unlicensed. The appellants therefore claim that Lembi, Skyline's *alter ego* or agent, cannot recover either. Appellants primarily rely on one case in support of their argument.

In *General Ins. Co.* v. *Superior Court,* 26 Cal.App.3d 176 [102 Cal. Rptr. 541], it was held that under the contractor's license law (Bus. & Prof. Code, § 7031) a corporation could not recover on a contract where the

corporation was never duly licensed as a contractor, despite the fact that the person who was the sole owner, president, chairman of the board and responsible managing officer thereof held a valid contractor's license.

Notwithstanding the integrity of the preceding case as applied to corporate *contractors*, the argument ignores the probate court's express finding that the services were performed by Lembi individually and its implied finding that Lembi was merely doing business under a fictitious name. The argument also ignores more persuasive authority which is more akin to the factual situation involved in this case.

In *Schantz* v. *Ellsworth,* 19 Cal.App.3d 289 [96 Cal.Rptr. 783], a license was issued to Melvin Rucker Schantz at 1741 West Katella, Anaheim; however, Schantz also conducted a real estate business at 401 West Katella, Anaheim under the fictitious name Investment Trends; he procured some leases for the defendant while working out of the Investment Trends office; defendant refused to pay him, claiming Schantz did not have a branch office license (Bus. & Prof. Code, §§ 10162, 10163) or a license authorizing him to do business in the fictitious name as required by section 10159.5 of the Business and Professions Code. Nevertheless, the court held that the licensing law does not require a licensed broker who has a branch office or who does business under a fictitious name to have a branch office license or a fictitious name license authorizing the use of the fictitious name under which his services were rendered; the court based its decision on two premises: (1) the purpose of the licensing law is to protect the public from the perils incident to dealing with incompetent or untrustworthy real estate brokers and such purpose is satisfied by proof of a valid real estate broker's license; and (2) the licensing law should not be so literally construed as to require exact compliance "if it would transform the statute into an 'unwarranted shield for the avoidance of a just obligation.' [Citations.]"

The *Schantz* rationale is particularly appealing here. Lembi was licensed. Attorney Meserve informed the court that Lembi's license read "Frank E. Lembi dba Skyline Realty." The court determined that Lembi rendered valuable services to the estate and awarded him accordingly.

 It is next contended that Lembi cannot recover because he acted in the dual role of purchaser-broker.

 The relationship of a real estate broker to his principal not only imposes upon him the duty of acting in the highest good faith towards his principal but precludes the broker from obtaining any advantage over the principal in any transaction had by virtue of his agency. (*Batson* v. *Strehlow,* 68 Cal.2d 662, 674-675 [68 Cal.Rptr. 589, 441 P.2d 101].) In fact, a

minority of foreign jurisdictions hold that a broker-purchaser cannot collect a commission even where he discloses his dual capacity (see *Stewart* v. *Mather,* 32 Wis. 344; *Christianson* v. *Mille Lacs Land and Loan Co.* (1910) 113 Minn. 120 [129 N.W. 150], but this is not the California rule. ■ While an agent owes a duty of acting in the highest good faith towards his principal, he nonetheless may acquire property from his principal, provided he makes a full disclosure of all material facts concerning the transaction which might affect the principal's decision. (*Donnellan* v. *Rocks,* 22 Cal.App.3d 925 [99 Cal.Rptr. 692].)

■ Public policy considerations dictate that brokers be allowed to act in a dual capacity, providing they make a full disclosure. This is particularly true in connection with sales involving large, valuable pieces of property to encourage brokers to expend substantial time, money and effort to effect a sale and to acquire an interest in the property themselves. Nor is there anything ominous about brokers acting in a dual capacity in probate sales. Sufficient safeguards presently exist to protect the estate's interests. Without detailing all those legal precautions, suffice it to say that the appraisal, notice, and public sale requirements of the Probate Code are sufficient deterrents to the practice of any possible deception on the estate's legal representatives. Additionally, such sales are subject to judicial approval.

Here the court found Lembi had made full disclosure. Although appellants urge there were no facts to support such a finding in that no evidentiary hearing was held, it may be noted that the estate was represented at all times by competent counsel. The bid to buy the property was signed by Lembi and the acceptance by broker was signed by Lembi. Consequently, there was documentary evidence to support the finding. In fact, the memoranda were filed by the estate.

### DUE PROCESS

■ Appellants and cross-appellants both claim the court deprived them of a full evidentiary hearing on the issue of Lembi's entitlement to a commission. In addition, Seeley-McGonagle claim they should have been permitted to produce testimony as to the amount of the commission to be allowed.

As previously noted, the record discloses that all parties were represented by counsel at the time of the hearing on the petition for confirmation. When the matter was called on December 9, the only reference to the brokerage was made by counsel for the estate who informed the court in sub-

stance that there was a question about the broker's commission on the original bid. But the estate and the prospective bidders insisted the sale be immediately confirmed so as to comply with the escrow closing date of December 17, 1971 (at which time the sale proceeds were required to pay the first installment of the federal estate tax which was due the following day). In a genuine effort to accommodate the interested parties and not jeopardize the sale, the court announced that it would conduct the sale and take the matter of the broker's commission under submission and would rule on it at a later date. The bidding was then opened and the sale confirmed to Albrecht and Lund for $6,750,000, with the amount of the broker's commission left blank thereon. Later the court issued its two orders authorizing the payment of $76,500 to Lembi and $95,250 to Seeley-McGonagle.

Seeley-McGonagle and the co-executrices then moved for a new trial, claiming Lembi was not entitled to a commission and that an evidentiary hearing should have been conducted.

It is apparent that all interested persons who wanted to be heard were accorded the opportunity at the time of the hearing on the petition for confirmation. It was only after the court made its findings and orders in re the commission that any request for an evidentiary hearing was made in the form of a motion for a new trial. At that point in the proceedings, the estate had accepted the benefits of the sale and had an enormous amount of cash with which to satisfy tax claims. Seeley-McGonagle's clients had purchased the Village and Seeley and McGonagle knew that a huge commission had already been awarded their respective firms. Suffice it to say, at the time of the hearing on the motion for new trial, the court considered all of the contentions, authorities and offers made by the appellants herein and properly rejected them.

Section 785 of the Probate Code requires that at the hearing on the return of sale "the court must examine into the necessity of the sale, or the advantage, benefit and interest of the estate in having the sale made, and must examine the return and witnesses in relation to the sale, . . ." The statute also requires the court to determine the amount of commission to be paid to any agents involved in the sale.

The foregoing section must be read in conjunction with section 756 of the Probate Code which provides in part as follows: "Any person interested in the estate may file *written* objections to the confirmation of the sale and may be heard thereon, and may produce witnesses in support of his objections. . . ." (Italics added.) "Probate Code section 756 requires that

written objections to the confirmation of the sale be filed and that after this the court may hear objections." (*Estate of Mitchell,* 12 Cal.App.3d 1169, 1171 [91 Cal.Rptr. 334].) This section is phrased in mandatory terms.

Rather than filing written objections to the confirmation of sale or to the allowance of a broker's commission, the co-executrices executed the petition for confirmation and prayed for approval of the commission. Notwithstanding that no written objections had been filed, the court nevertheless permitted counsel for the co-executrices to argue that Skyline Realty was unlicensed. When all interested parties requested that the public sale proceed, the court made it perfectly clear it would take the commission matter under submission. The court did not preclude the parties from making their feelings known or from presenting any argument with respect to the commission issue. In fact, the court requested points and authorities before ruling on the commission issue and stated it would render its decision after the points and authorities had been filed. Still no evidentiary hearing was requested. Appellants and cross-appellants waived such a hearing by their conduct and by their failure to file written objections to an allowance. We are satisfied that the procedure that was followed here had the fairness that is the essence of due process. (*In re Franklin,* 7 Cal.3d 126 [101 Cal.Rptr. 553, 496 P.2d 465]; *Sokol* v. *Public Utilities Commission,* 65 Cal.2d 247 [53 Cal.Rptr. 673, 418 P.2d 265].)

While the appellants and cross-appellants argue that they were not required to file written objections to the petition for confirmation and they were surprised by the court's action in ruling on the commission without an evidentiary hearing, the argument is not persuasive. On the day of the sale, Seeley-McGonagle's agents inquired whether Lembi's commission could be set-off against his bid; co-executrices' counsel questioned his right to a commission. Granting the appellants and cross-appellants wanted the sale confirmed, they still could have requested an evidentiary hearing if they wanted one. They did not.

However, they charge there was no evidence received upon which to sustain the findings. This argument ignores the fact that there was a return and petition filed. In addition to the verified allegations contained therein, there was also the following documentary evidence presented by the co-executrices: (1) the bid; (2) the co-executrices' acceptance; and (3) the acceptance by the broker. Obviously the court construed these instruments to determine the commission issue before making the commission order. In addition, the court considered the appellants' and cross-appellants' motions for a new trial. These motions were partially predicated on the premise that

no evidentiary hearing had been held and the court properly rejected the argument. Moreover, at the time of the hearing on the motions for a new trial, the court received affidavits and declarations indicating that Lembi had made a full disclosure to the co-executrices; that he was not only the buyer but also the bidder (as reflected in the bid and broker's acceptance); and that the attorney for the estate had, or should have had, full knowledge of Lembi's dual role as purchaser-broker. In fact, the bid and the co-executrices' and broker's acceptance all corroborated full disclosure.

## SEELEY-McGONAGLE'S COMMISSION

At the time of the hearing on the motion for a new trial, Seeley-McGonagle argued they were entitled to the entire commission ($171,000) if Lembi's broker's allocation was disallowed. They also contended they were entitled to a full evidentiary hearing on the issue as to the amount of their commission. We have already determined that Lembi was entitled to the commission and that due process was accorded appellants and cross-appellants. However, Seeley and McGonagle also maintain that the fee allocated their firms was unreasonable.[2]

Section 761 of the Probate Code provides as follows: "In case of sale on an increased bid made at the time of confirmation to a purchaser not procured by the agent holding the contract [with the estate], the court shall allow a commission on the full amount for which the sale is confirmed, one-half of said commission on the original bid to be paid to the agent whose bid was returned to the court for confirmation . . . ."

Section 785 requires the court to determine the amount of commissions to be paid to agents involved in the sale in the event there is an original bidder represented by a broker and a successful bidder represented by a broker. This section merely provides that the broker for the successful bidder should be paid "a reasonable compensation. . . ."

The fee allocated Seeley-McGonagle was reasonable. The return of sale on Lembi's bid set forth a formula for fixing the fee. The percentages were realistic in light of the purchase price. The fee awarded was sizable.

[2]A serious question exists as to whether Seeley-McGonagle has any *standing* to appeal. Neither firm was "aggrieved" by the orders, and this, within the meaning of section 902 of the Code of Civil Procedure, would appear to vitiate any standing to appeal. (*Leoke* v. *County of San Bernardino*, 249 Cal.App.2d 767 [57 Cal.Rptr. 770]; *Butterfield* v. *Tietz*, 247 Cal.App.2d 483 [55 Cal.Rptr. 577]; *Hamilton* v. *Hamilton*, 83 Cal.App.2d 771 [189 P.2d 722].) However, we are inclined to resolve both appeals on the merits inasmuch as we previously denied a motion to dismiss the Seeley-McGonagle appeal.

Probate judges possess considerable expertise on the subject of broker's fees and commissions. It is common knowledge that a 10 percent commission on raw land is customary and that 6 percent on a small, improved parcel is common. However, as the value of the property increases, the percentage of the fee diminishes for reasons within the knowledge of every broker. Seeley-McGonagle received a magnificent fee for the services rendered.

The orders are affirmed.

Gardner, P. J., and Kaufman, J., concurred.

The application of petitioners and appellants for a hearing by the Supreme Court was denied December 5, 1973.